[Crim. No. 13617. In Bank. Feb. 18, 1972.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT PAGE ANDERSON, Defendant and Appellant.

## COUNSEL

Neri Ramos and Jerome B. Falk, Jr., under appointments by the Supreme Court, and Anthony G. Amsterdam for Defendant and Appellant.

Ernest L. Graves, Renzi & Kilbride, Fred T. Kilbride, Gerald H. Gottlieb and Earl Klein as Amici Curiae on behalf of Defendant and Appellant.

Thomas C. Lynch and Evelle J. Younger, Attorneys General, Herbert L. Ashby, Chief Assistant Attorney General, William E. James, Assistant Attorney General, Thomas Kally and Ronald M. George, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**WRIGHT, C. J.** — A jury found Robert Page Anderson guilty of first degree murder, the attempted murder of three men, and first degree robbery, and fixed the penalty at death for the murder. The judgment was affirmed. (*People* v. *Anderson* (1966) 64 Cal.2d 633 [51 Cal.Rptr. 238, 414 P.2d 366].) Thereafter the remittitur was recalled and the judgment was reversed insofar as it related to the death penalty under the compulsion of *Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770]. (*In re Anderson* (1968) 69 Cal.2d 613 [73 Cal.Rptr. 21, 447 P.2d 117].)

A second trial was had on the issue of the penalty for the murder, and the jury again imposed the death penalty. A motion for a new trial was denied, and this appeal is now before us automatically under subdivision (b) of Penal Code section 1239.

Defendant contends that error was committed in selecting the jury, that certain evidence was improperly admitted, that the prosecutor was guilty of prejudicial misconduct, and that the death penalty constitutes both cruel and unusual punishment and, as such, contravenes the Eighth Amendment to the United States Constitution and article I, section 6, of the Constitution of California. We have concluded that capital punishment is both cruel and unusual as those terms are defined under article I, section 6, of the California Constitution, and that therefore death may not be exacted as punishment for crime in this state. Because we have determined that the California Constitution does not permit the continued application of capital

punishment, we need not consider whether capital punishment may also be proscribed by the Eighth Amendment to the United States Constitution.[1]

### The California Constitution

Before undertaking to examine the constitutionality of capital punishment in light of contemporary standards, it is instructive to note that article I, section 6, of the California Constitution,[2] unlike the Eighth Amendment to the United States Constitution,[3] prohibits the infliction of cruel *or* unusual punishments. Thus, the California Constitution prohibits imposition of the death penalty if, judged by contemporary standards, it is either cruel or has become an unusual punishment.

Some commentators have suggested that the reach of the Eighth Amendment and that of article I, section 6, are coextensive, and that the use of the disjunctive form in the latter is insignificant.[4] Our review of the history of the California provision persuades us, however, that the delegates to the Constitutional Convention of 1849, who first adopted the section which was later incorporated into the Constitution of 1879, were aware of the significance of the disjunctive form and that its use was purposeful.

The California prohibition of cruel or unusual punishment first appeared as part of the "Declaration of Rights" proposed by the Select Committee of the Constitutional Convention as article I of the Constitution to be drafted by the House of Delegates. When proposed on September 7, 1849, section V of article I declared: "Excessive bail shall not be required, nor excessive fines imposed, nor shall cruel *and* unusual punishments be inflicted, nor shall witnesses be unreasonably detained."[5] (Italics added.) But for the

---

[1]We note that this issue is presently before the United States Supreme Court. (*Aikens* v. *California,* No. 68-5027; *Furman* v. *Georgia,* No. 69-5003; *Jackson* v. *Georgia,* No. 69-5030.)

[2]Article I, section 6: "All persons shall be bailable by sufficient sureties, unless for capital offenses when the proof is evident or the presumption great. Excessive bail shall not be required, nor excessive fines imposed; *nor shall cruel or unusual punishments be inflicted.* Witnesses shall not be unreasonably detained, nor confined in any room where criminals are actually imprisoned." (Italics added.)

[3]United States Constitution, Amendment VIII: "Excessive bail shall not be required, nor excessive fines imposed, *nor cruel and unusual punishments inflicted.*" (Italics added.)

[4]Comment, *The Death Penalty Cases* (1968) 56 Cal.L.Rev. 1268, 1326, footnote 502. But see, Mosk, *The Eighth Amendment Rediscovered* (1968) 1 Loyola L.A.L.Rev. 4, 17-18.

[5]Browne, Debates in the Convention of California (1850) page 30 (hereinafter "1849 Debates").

addition of the "witness" clause, the proposed section was identical to the Eighth Amendment to the United States Constitution. The delegates were advised when the Declaration of Rights was first proposed that the first eight sections had been taken from the Constitution of New York and that all others were from the Constitution of Iowa.[6] On September 8, 1849, the convention resolved into a committee of the whole and adopted the fifth section without debate. Nor was there any debate on the section during the following month. On October 10, 1849, however, when the House of Delegates adopted the section it specified that cruel *or* unusual punishments were prohibited. The reporter of the debates stated only that "Article I of the constitution on the 'Declaration of Rights,' was taken up, read the third time, a few verbal errors corrected, and then passed."[7]

Article I, section 5, of the 1846 Constitution of New York, the first New York Constitution to include such a prohibition, proscribed cruel *and* unusual punishments.[8] The 1846 Iowa Constitution, after which many of the sections of the proposed Declaration of Rights were patterned, also proscribed cruel *and* unusual punishments.[9] Thus, it is apparent that the delegates did not make the change in order to correct a "verbal error" in transcribing the provision from the New York original, nor was it an attempt to conform it to the Iowa Constitution.

Although the delegates to the convention were limited in their access to models upon which to base the proposed California Constitution at the commencement of their deliberations,[10] by the end of the convention they had access to the constitutions of every state.[11] At least 20 state constitutions were mentioned by delegates during the debates.[12] The majority of those which included declarations of rights or equivalent provisions differed from the New York, Iowa, and United States Constitutions and did not proscribe cruel *and* unusual punishments. Rather, they prohibited "cruel

---

[6]*Id.* page 31.

[7]*Id.* page 458.

[8]5 Thorpe, American Charters, Constitutions, and Organic Laws (1909) page 2654 (hereinafter "Thorpe").

[9]2 Thorpe, page 1125.

[10]W. M. Gwin, formerly a congressman from Mississippi, who reputedly came to California in order to become a senator from the new state, was named a delegate to the convention and arrived prepared with copies of the Iowa Constitution which he distributed among the delegates. (Browne, 1849 Debates, p. 24.)

[11]*Id.* page 221.

[12]*Id.* pages 37, 56, 69, 110, 380, 384.

punishments,"[13] or "cruel or unusual punishments."[14] Several had provisions requiring that punishment be proportioned to the offense[15] and some had dual provisions prohibiting cruel and/or unusual punishments and disproportionate punishments.[16]

■ The fact that the majority of constitutional models to which the delegates had access prohibited cruel or unusual punishment, and that many of these models reflected a concern on the part of their drafters not only that cruel punishments be prohibited, but that disproportionate and unusual punishments also be independently proscribed, persuades us that the delegates modified the California provision before adoption to substitute the disjunctive "or" for the conjunctive "and" in order to establish their intent that both cruel punishments and unusual punishments[17] be outlawed

---

[13]E.g., Pennsylvania Constitution of 1838, article IX, section 13 (5 Thorpe, p. 3114); Alabama Constitution of 1819, article I, section 16 (1 Thorpe, p. 98); Delaware Constitution of 1831, article I, section 11 (1 Thorpe, p. 583); Kentucky Constitution of 1799, article X, section 15 (3 Thorpe, p. 1290); Mississippi Constitution of 1832, article I, section 16 (4 Thorpe, p. 2050); Rhode Island Constitution of 1842, article I, section 8 (6 Thorpe, p. 3223); South Carolina Constitution of 1790, article IX, section 4 (6 Thorpe, p. 3264).

[14]E.g., North Carolina Constitution of 1776, paragraph X (5 Thorpe, p. 2788); Florida Constitution of 1838, article I, section 12 (2 Thorpe, p. 665); Massachusetts Constitution of 1780, article XXVII of Declaration of Rights (3 Thorpe, p. 1892); New Hampshire Constitution of 1792, Part First, article XXIII (4 Thorpe, p. 2474).

[15]E.g., Arkansas Constitution of 1836, article II, section 13: "That all penalties shall be reasonable and proportioned to the nature of the offense." (1 Thorpe, p. 270); Illinois Constitution of 1848, article XIII, section 14: "All penalties shall be proportioned to the nature of the offense; the true design of all punishment being to reform, not to exterminate mankind." (2 Thorpe, p. 1008); New Hampshire Constitution of 1792, Part First, article XVIII (4 Thorpe, p. 2473).

[16]E.g., Indiana Constitution of 1816, article I, section 15 (cruel and unusual punishment) and section 16 ("All penalties shall be proportioned to the nature of the offense") (2 Thorpe, p. 1059); Maine Constitution of 1819, article I, section 9 ("shall be proportioned to the offense . . . nor cruel nor unusual punishments inflicted") (3 Thorpe, pp. 1647-1648); Rhode Island Constitution of 1842, article I, section 8 ("nor cruel punishments inflicted" and "all punishments ought to be proportioned to the offense") (6 Thorpe, p. 3223).

[17]The delegates to the constitutional convention of 1849 had reason to be concerned with outlawing punishments which, although apparently accepted as necessary and not unduly cruel, were unusual. The absence of any effective government at the time of the discovery of gold and consequent proliferation of mining camps, had resulted in the administration of justice, such as it was, in the camps by vigilante committees. (3 Hittell, History of California (1898) p. 272 and *passim* [hereinafter Hittell].) Lacking means other than direct administration of physical punishment by which to enforce their judgments, the miners developed a variety of punishments which can only be described as "unusual" even in that day. Hittell described the punishment imposed upon a thief who had been sentenced to be hanged, but whose punishment was modified when death was thought to be too severe. "[U]pon the suggestion of a milder punishment, it was determined that the culprit should receive

in this state.[18] In reaching this conclusion we are mindful also of the well established rules governing judicial construction of constitutional provisions. We may not presume, as respondent would have us do, that the framers of the California Constitution chose the disjunctive form "haphazardly," nor may we assume that they intended that it be accorded any but its ordinary meaning. (*Los Angeles Met. Transit Authority* v. *Public Util. Com.* (1963) 59 Cal.2d 863, 869 [31 Cal.Rptr. 463, 382 P.2d 583]; *Lockhart* v. *Wolden* (1941) 17 Cal.2d 628, 631 [111 P.2d 319].)

The same rules of construction require that wherever possible we construe constitutional provisions in such a way as to reconcile potential conflict among provisions and give effect to each. (*People* v. *Western Air Lines, Inc.* (1954) 42 Cal.2d 621, 637 [268 P.2d 723].) It has been suggested that we are therefore restrained from considering whether capital punishment is proscribed by article I, section 6, since the death penalty is expressly or impliedly recognized in several other provisions of the Cali-

---

a hundred lashes on his bare back and have his ears cut off and his head shaved so that he might everywhere be recognized in the mining districts as a felon." (*Id.* p. 273.) Public flogging followed by banishment from the district was a common punishment. Even under the Mexican Governors, unusual punishments had been devised to deter lawlessness. In 1824 Governor Arguello, having determined that the "usual punishments" had been ineffective, decreed that theft of property valued at over 200 reals, burglary, and housebreaking were to be punished by death and that if murder had occurred during the commission of those offenses, the body should be quartered. Theft of property worth from 10 to 50 reals was to be punished by condemning the perpetrator to 10 years at public labor. Between 50 and 200 reals, the 10 years' labor was to be accompanied by "six public floggings or run the gauntlet of two hundred men armed with heavy switches six times." (2 Hittell, p. 79.)

[18]We find no indication in the Debates and Proceedings of the Constitutional Convention of 1878-1879 that the delegates to that convention intended any change in the meaning of the section. To the contrary, it appears from one debate on the question of amending the section to expressly provide that whipping was not cruel or unusual punishment, that the delegates were concerned that cruel punishments such as whipping not be reintroduced irrespective of whether whipping had existed at common law, had been reinstituted in England, and still survived in other states. The delegates were concerned with its cruel nature and not with the question of whether it was an "unusual" punishment. (Willis and Stockton, Debates and Proceedings (1880) pp. 244-245 [hereinafter "1879 Debates"].)

One delegate, noting that whipping was permitted in Delaware, and possibly in Kentucky and Virginia, suggested that their constitutions were substantially similar, and if the reason it was permitted there but had been declared unconstitutional by one California appellate court was that California's Constitution included the word "unusual," "then it is a sufficient answer to say that if it is to become fashionable, let it become fashionable elsewhere first, and the objection that it is unusual will cease to apply to our Courts." (1879 Debates, p. 246.) At the time the Kentucky and Delaware Constitutions prohibited only "cruel" punishments, although the Virginia Constitution prohibited "cruel and unusual" punishments. It is apparent that the delegates recognized the distinctions between the constitutions and considered the terms of the California Constitution to be disjunctive.

fornia Constitution.[19] We perceive no possible conflict or repugnance between those provisions and the cruel or unusual punishment clause of article I, section 6, however, for none of the incidental references to the death penalty purport to give its existence constitutional stature. They do no more than recognize its existence at the time of their adoption. Thus, the bail clause of article I, section 6, restricts the right to bail in capital cases; the due process clause of article I, section 13, ensures that life will not be taken without due process; and section 8 of article I allows felony defendants represented by counsel to plead guilty at an arraignment before a magistrate only in noncapital cases. Similarly, section 8 of article V gives the Governor power to reprieve and section 11 of article VI vests this court with appellate jurisdiction in cases in which the death penalty has been imposed. None of these provisions can be construed as an affirmative exemption of capital punishment from the compass of the cruel or unusual punishment clause of article I, section 6.

The provisions of sections 6 and 13 of article I which recognize the existence of capital punishment were carried over into the Constitution of 1879 from the Constitution of 1849. Section 8 of article I was added in 1879 in a modification which discarded the former requirement that the prosecution in capital and other infamous crimes proceed by indictment and permitted instead the use of an information.

■ The Governor's power to reprieve also originated in the 1849 Constitution as section 13 of article V. It became part of section 1 of article VII of the 1879 Constitution, and, in 1966 was incorporated into the present section 8 of article V. This court was given appellate jurisdiction of all felonies by the Constitution of 1849, and by the Constitution of 1879 as originally adopted, but in 1904 an amendment to section 4 of article VI transferred direct appellate jurisdiction in criminal cases other than those in which the death penalty had been imposed to the Courts of Appeal. The 1966 constitutional revisions shifted the amended provision to the present section 11 of article VI. These 1966 constitutional revisions did not ratify the death penalty as a permissible means of punishment not governed by the

---

[19]Article I, section 6: "All persons shall be bailable by sufficient sureties, unless for capital offenses . . ."; article I, section 8: ". . . If the felony charged is not punishable with death, the magistrate shall immediately upon the appearance of counsel for the defendant read the complaint to the defendant and ask him whether he pleads guilty or not guilty to the offense charged therein [and] the defendant may . . . plead guilty to the offense . . ."; article I, section 13: ". . . No person shall . . . be deprived of life . . . without due process of law; . . . "; article V, section 8: ". . . the Governor, on conditions he deems proper, may grant a reprieve, . . ."; article VI, section 11: "The Supreme Court has appellate jurisdiction when judgment of death has been pronounced."

cruel or unusual punishment clause of article I, section 6, for the revisions were merely part of a plan to modernize the Constitution of 1879. They did no more than shift from one section to another provisions recognizing the continued existence of the death penalty in the grant of powers to the judiciary and the executive department. Nothing in the legislative counsel's analysis, in the arguments for and against the revisions, or in the Secretary of State's official description of the ballot measure suggested to the voter that approval of Proposition 1-a in the election of November 8, 1966, would affirm the continuance of capital punishment.[20]

To interpret the adoption of Proposition 1-a or the presence in other provisions of the Constitution of references to capital punishment as intended to bar future judicial consideration of the possible cruel or unusual nature of capital punishment would violate the most elementary rules of constitutional construction. ■ "We do not . . . approve of that principle of constitutional construction, which seeks by vague surmises, or even probable conjecture, or general speculation of a policy not distinctly expressed, to control the express language of the instrument; since such a mode would not unfrequently change the instrument from what its framers made it, into what the Judges think it should have been." (*People* v. *Weller* (1858) 11 Cal. 77, 86.) ■ The Constitution expressly proscribes cruel or unusual punishments. It would be mere speculation and conjecture to ascribe to the framers an intent to exempt capital punishment from the compass of that provision solely because at a time when the death penalty was commonly accepted they provided elsewhere in the Constitution for special safeguards in its application.

### The Judicial Function

Having determined that under the California Constitution capital punishment is prohibited if it is either a cruel or an unusual punishment, and that no constitutional impediment exists to restrain our examination of the death penalty in light of contemporary standards, we must also define the

---

[20]The official description of Proposition 1-a advised: "Legislative Constitutional Amendment. Repeals, amends, and revises various provisions of Constitution relating to separation of powers, and to the legislative, executive, and judicial departments; provides for annual general legislative sessions; provides compensation of members of Legislature shall be prescribed by statute passed by two-thirds vote, and limits rate of annual future adjustments; Legislature must enact law as prohibiting members from engaging in conflicting activities. Signature necessary on petition for initiative statute reduced from 8% to 5%; eliminates initiatives to Legislature. Legislature shall provide for succession to the office of Governor in event of disability or vacancy." (Jordan, Proposed Amendments to Constitution, Propositions and Proposed Laws Together with Arguments To Be Submitted to the Electors of the State of California at the General Election Tuesday, Nov. 8, 1966 (1966) p. 1.)

role of the courts in giving effect to the cruel or unusual punishments clause of article I, section 6.

■ Our duty to confront and resolve constitutional questions, regardless of their difficulty or magnitude, is at the very core of our judicial responsibility. It is a mandate of the most imperative nature. Called upon to decide whether the death penalty constitutes cruel or unusual punishment under the Constitution of this state, we face not merely a crucial and vexing issue but an awesome problem involving the lives of 104 persons under sentence of death in California, some for as long as 8 years. There can be no final disposition of the judicial proceedings in these cases unless and until this court has decided the state constitutional question, a question which cannot be avoided by deferring to any other court or to any other branch of government.

■ The cruel or unusual punishment clause of the California Constitution, like other provisions of the Declaration of Rights, operates to restrain legislative and executive action and to protect fundamental individual and minority rights against encroachment by the majority. It is the function of the court to examine legislative acts in light of such constitutional mandates to ensure that the promise of the Declaration of Rights is a reality to the individual. (*Bixby* v. *Pierno* (1971) 4 Cal.3d 130, 141 [93 Cal.Rptr. 234, 481 P.2d 242].) Were it otherwise, the Legislature would ever be the sole judge of the permissible means and extent of punishment and article I, section 6, of the Constitution would be superfluous.

■ Speaking of the Eighth Amendment to the United States Constitution, the United States Supreme Court declared: "While the State has the power to punish, the Amendment stands to assure that this right be exercised within the limits of civilized standards." (*Trop* v. *Dulles* (1958) 356 U.S. 86, 100 [2 L.Ed.2d 630, 642, 78 S.Ct. 590].) The cruel or unusual punishment provision of the California Constitution serves an identical purpose. ■ The Legislature is thus accorded the broadest discretion possible in enacting penal statutes and in specifying punishment for crime, but the final judgment as to whether the punishment it decrees exceeds constitutional limits is a judicial function. (*Weems* v. *United States* (1910) 217 U.S. 349, 379 [54 L.Ed. 793, 803, 30 S.Ct. 544].)

Respondent, while conceding the power and responsibility of the court to review penal statutes in light of article I, section 6, urges that we must accept as controlling indicia of contemporary civilized standards of decency both legislative acts creating new capital crimes and legislative acquiescence in the continuation of capital punishment. Although we accord

great deference to the judgment of the Legislature in this respect, we would abdicate our responsibility to examine independently the question were our inquiry to begin and end with the fact that statutory provisions authorizing imposition of the death penalty have been recently enacted or continue to exist. (*People* v. *Lynch* (1875) 51 Cal. 15, 25-26.)

### The Prior California Decisions

Although we have often considered challenges to the constitutionality of capital punishment, we have heretofore approached the question in the Eighth Amendment context of "cruel *and* unusual" punishment, using that term interchangeably with the "cruel *or* unusual" language of article I, section 6, of the California Constitution,[21] and have never independently tested the death penalty against the disjunctive requirements of the latter. As a consequence of this emphasis on the Eighth Amendment approach the majority of our prior opinions have focused on justifications for continuation of the death penalty which were then believed to exempt it from the federal constitutional prohibition of cruel and unusual punishment without regard to whether it was cruel. This disregard of the cruelty question is understandable when it is realized that at the time article I, section 6, was drafted in 1849,[22] and when it was readopted in

---

[21]The constitutionality of a particular mode of punishment appears to have been first considered by this court in *State* v. *McCauley* (1860) 15 Cal. 429, in which it was sought to enforce the defendant's contractual obligation to pay for the lease of prison labor. He sought to avoid payment on various grounds, among them on the asserted ground that the act authorizing the lease was void. Rejecting that argument, the court stated: "The only limitation [on the Legislature's power to fix punishments for crime] is the inhibition against the infliction of cruel *and* unusual punishments, which are held to mean those of a barbarous character, and unknown to the common law." (15 Cal. at p. 455; italics added.) In *Ex Parte Mitchell* (1886) 70 Cal. 1 [11 P. 488], however, we upheld a two-year prison term and $4,000 fine for assault with a deadly weapon, stating it was "not excessive, cruel or unusual within the meaning of section 6, article I, of the Constitution." (70 Cal. at p. 2.)

[22]On September 11, 1849, L. W. Hastings, an attorney delegate from the Sacramento District, introduced the following resolution: "As the true design of all punishment is to reform and not to exterminate mankind, death shall never be inflicted as a punishment for crime in this state."

The reporter recorded the debate: "Mr. McCarver seconded the resolution [to ban capital punishment] not because he believed the House would adopt it, or that it could be adopted here, but because he considered the question entitled to a fair consideration. If the [sponsor] would devise a plan by which criminals could be properly punished in this country, he would go with him; but as California is situated at present, it is impracticable. The construction of penitentiaries would be enormously burdensome. . . . As to the right to take human life, it is very questionable whether we have that right; but as it has been a practice ever since the world was created, perhaps it would be as well to let it rest a while longer. It may be that it is a good old principle established by the experience of ages. He would vote against the resolution, not because he was opposed to it, but because he considered it impracticable to accomplish the object under existing circumstances." (1849 Debates, pp. 45-46.)

1879,[23] capital punishment was not considered so cruel as to warrant proscription, and was a widely accepted, customary punishment in the fledgling state. Hanging had been a popular form of vigilante justice,[24] and even after the new state instituted a judicial and penal system, public executions continued.[25] Thus, at the time of our earliest decisions upholding capital punishment, a substantial proportion of California's residents had witnessed executions. It was not a remote or abstract concept, and the question as to whether capital punishment might violate standards of decency then accepted or shock the conscience of the people of that time did not often arise. When it did, the question could be summarily disposed of by a court which then understandably assumed that capital punishment was not so cruel as to be proscribed by the state or federal Constitutions. Since the cruelty of capital punishment was not then a substantial issue, any doubts as to the constitutionality of the death penalty were resolved by resorting to its continuing and usual acceptance. The emphasis of our prior opinions was thus placed on the common or usual rather than the "cruel" aspect of the punishment.

One J. W. Finley appears to have been the first defendant to challenge the death penalty in California on grounds that it violated article I, section 6, of the California Constitution. A life prisoner at Folsom, he had committed a malicious assault on another prisoner, an offense punishable by death. While awaiting trial he challenged the then applicable Penal Code section (Pen. Code, § 246; now Pen. Code, § 4500) on constitutional grounds. The Court of Appeal rejected his challenge, answering its own question "Is the punishment cruel or unusual," by justifying it as among the

---

[23]In 1879, opinion among the delegates was still mixed. See footnote 18, *supra*. One delegate opposing a resolution which would have expressly declared whipping to be acceptable, suggested that hanging was so cruel as to be permitted only under a "strained construction" of what is now article I, section 6. He stated: "I hold that under the operation or under a strict construction of that provision of the Constitution—'nor shall cruel or unusual punishment be inflicted'—I hold that no man can be hanged, because who will assert that to take a man and drag him up and let him choke to death is not cruel? We all know that it is cruel. There can be nothing more cruel conceived by the mind of man. It is torture the most horrible. And yet it is done. But it is done under a strained construction of that provision; . . ." (1879 Debates, p. 244.)

Mr. Blackmer, of San Diego County, questioned: "It is stated here that we have a right to take life under the law, and it is admitted on all hands that it is a cruel punishment. I want to ask the gentleman if it deters from the crime of murder. Does the fact that we have the right, and that that law is carried out in many instances, deter people from committing that crime of murder? Not at all." (*Id.* p. 245.) Not all delegates agreed, however, that the death penalty was cruel.

[24]3 Hittell, *supra*, pages 274, 277-278.

[25]Public executions were not abolished until 1858. (Stats. 1858, p. 192, § 1. Now Pen. Code, § 3603.)

"severe penalties . . . necessary to deter men from defying law and daring the consequences." (*In re Finley* (1905) 1 Cal.App. 198, 201 [81 P. 1041].) The *Finley* court adopted an "excessive" or "disproportionate" test by which to judge whether a punishment was "unusual" and concluded that "only when the punishment is out of all proportion to the offense, and is beyond question an *extraordinary penalty* for a crime of *ordinary gravity committed under ordinary circumstances,* that courts may denounce it as *unusual*." (1 Cal.App. 198, 202; italics in original.) The court, perhaps mindful of our decision in *Ex Parte Mitchell, supra,* 70 Cal. 1, in which we had used the disjunctive language of article I, section 6, did purport to separately consider whether the penalty was "cruel," but instead of examining that question independently, assumed that the death penalty could not be "cruel *per se,* for the whole current of law for centuries justifies the infliction." (*Ibid.*) Thus, California adopted the cruel *and* unusual punishment approach, which has been followed by the United States Supreme Court, of finding justification for capital punishment in its deterrent effect, and weighing only whether it was an excessive or unusual punishment, without independent consideration of whether it is cruel.

When Finley appealed to this court after his conviction, he did not claim that the death penalty constituted cruel or unusual punishment. Instead, he challenged the imposition of the death penalty for malicious assault on equal protection grounds, claiming that there was no justification for imposing such a severe penalty on life prisoners when others who committed the same offense were treated more leniently. We rejected the equal protection claim on the dual ground that the distinction was reasonable because it was necessary to have a more severe punishment to deter life prisoners, and because since they were already serving life terms no greater punishment could be imposed except death. (*People* v. *Finley* (1908) 153 Cal. 59 [94 P. 248].)

Although Finley did not directly challenge the death penalty in this court on cruel and unusual punishment grounds, the approaches to its constitutionality taken by the Court of Appeal in the first *Finley* case and by this court in the second *Finley* case became firmly established in California law in 1909 when we rejected a second challenge to the infliction of the death penalty for aggravated assault by a life prisoner. Jacob Oppenheimer, a life prisoner at San Quentin, undeterred by the existence of the penalty, assaulted another prisoner in the prison dining room with a knife. He was convicted, the death penalty was imposed, and, on appeal to this court, he contended that then section 246 of the Penal Code was unconstitutional. Citing our prior *Finley* opinion, we noted that the validity of the section had been upheld against an equal protection

challenge. But Oppenheimer had also claimed that the death penalty constituted cruel or unusual punishment. Although we recognized that " 'cruel' or 'unusual' " punishments were barred by section 6 of article I of the California Constitution, we did not examine the possibility that capital punishment might be cruel. Instead we declared: "The infliction of the death penalty by any of the methods ordinarily adopted by civilized people, such as hanging, shooting, or electricity, is neither a cruel nor unusual punishment (see *In re Kemmler,* 136 U.S. 447 . . . ) unless perhaps it be so disproportionate to the offense for which it is inflicted as to meet the disapproval and condemnation of the conscience and reason of men generally, 'as to shock the moral sense of the people.' [Citation.] In view of what is said in *People* v. *Finley,* as to the reasons for such provision . . . , we are of the opinion that no such conclusion can be reached in regard to the statute under consideration." (*People* v. *Oppenheimer* (1909) 156 Cal. 733, 737-738 [106 P. 74].) By adopting what had originally been the basis for rejecting an equal protection challenge to the death penalty, we established justification, proportionment to the offense, and common practice among civilized peoples, as the tests by which to measure capital punishment against constitutional challenge, notwithstanding the alternative criteria of cruel *or* unusual punishments established by section 6, article I, of the California Constitution. Since the death penalty furthered a permissible purpose of punishment, was commonly practiced among civilized people, and was not disproportionate to the offense, it did not offend the Constitution.

The majority of challenges to the death penalty in this state since *Oppenheimer* have been rejected either without further exploration of the cruel or unusual punishment question, or by finding justification for continuance of capital punishment. (E.g., *People* v. *Lazarus* (1929) 207 Cal. 507, 514 [279 P. 145] ["It is not necessary to cite authorities for the purpose of showing that this contention has uniformly been held to be unmeritorious"]; *In re Wells* (1950) 35 Cal.2d 889, 895 [221 P.2d 947] ["We are convinced that [*Oppenheimer*] was correctly decided. (See also *In re Finley* (1905) 1 Cal.App. 198, 203 . . . .)"]; *People* v. *Bashor* (1957) 48 Cal.2d 763 [312 P.2d 255] [citing *Lazarus* and *Wells*].)

When justifications offered in support of continuance of the death penalty were more recently challenged, we continued to uphold it on the ground that it had long been practiced and its application upheld, without, however, independently reexamining the question of the cruelty of the punishment in the reality of present day conditions. (*In re Anderson, supra,* 69 Cal.2d 613, 631.) Although our decision in *Anderson* turned largely

upon the issue of lack of standards, and we did in that case comment upon the issue of cruel or unusual punishment, we examined the issue on the basis of the conjunctive cruel *and* unusual punishment. Thus our approach heretofore has paralleled that of the United States Supreme Court in rejecting challenges brought under the Eighth Amendment in finding justification for capital punishment and upholding it if it is not disproportionate to the offense. (See Goldberg and Dershowitz, *Declaring the Death Penalty Unconstitutional* (1970) 83 Harv.L.Rev. 1773, 1784-1798.)

Now, however, as the California constitutional history demonstrates, we must probe the issue on the basis of the disjunctive cruel *or* unusual punishment.

### The Constitutionality of Capital Punishment Today

Well over a century has now passed since the day when vigilante justice and public hangings made executions an accepted practice of California life. We cannot today assume, as it was assumed in early opinions of this court, that capital punishment is not so cruel as to offend contemporary standards of decency. Appellant has asked that we not only reexamine the validity of the prior bases upon which the death penalty has been upheld, but that we independently examine its cruelty applying contemporary standards. As we shall discuss at greater length below, we have done so and have concluded that capital punishment is "cruel" as that term is understood in its constitutional sense. We have also, at the instance of both appellant and respondent, reexamined the bases upon which capital punishment has been upheld heretofore. As will appear, we have concluded that the death penalty cannot be justified as furthering any of the accepted purposes of punishment. Moreover, we have concluded that it can no longer escape characterization as an "unusual" punishment.

### 1. The Constitutional Meaning of Cruelty

Respondent contends that a punishment is constitutionally proscribed only if it is both unnecessarily cruel and is unusual. We have already concluded, however, that the California Constitution prohibits either cruel *or* unusual punishments, and have indicated that we believe capital punishment to be cruel in the constitutional sense. We have not had occasion heretofore to consider whether a cruel punishment can avoid the proscription of article I, section 6, upon a showing that it is "necessary." Before examining the validity of that proposition, we shall set forth our reasons for concluding that capital punishment is cruel in the constitutional sense.

It merits emphasis that in assessing the cruelty of capital punishment under article I, section 6, we are not concerned only with the "mere extinguishment of life," which the United States Supreme Court has suggested does not violate the Eighth Amendment (*In re Kemmler* (1890) 136 U.S. 436, 447 [34 L.Ed. 519, 524, 10 S.Ct. 930]), or with a particular method of execution (cf. *Francis* v. *Resweber* (1947) 329 U.S. 459, 463-464 [91 L.Ed. 442, 426-427, 67 S.Ct. 374]; *In re Kemmler, supra,* 136 U.S. 436, 444-449 [34 L.Ed. 519, 523-525]; *People* v. *Daugherty* (1953) 40 Cal.2d 876, 894-896 [256 P.2d 911]), but with the total impact of capital punishment, from the pronouncement of the judgment of death through the execution itself, both on the individual and on the society which sanctions its use. Our concern is that the execution which ultimately follows pronouncement of the death sentence has in fact become the "lingering death" which the *Kemmler* court conceded would be cruel in the constitutional sense. (*In re Kemmler, supra,* 136 U.S. 436, 447.)

■ We do not interpret the constitutional prohibition of cruel or unusual punishments either as a license for the indefinite continuance of all punishments known to the common law or practiced at the time California attained statehood, nor as a proscription of innovative types of punishment whose purpose is the rehabilitation or reformation of criminal offenders. Historical analysis suggests that the framers intended to outlaw both cruel punishments and punishments of excessive severity for ordinary offenses. They used the term cruel in its ordinary meaning— causing physical pain or mental anguish of an inhumane or torturous nature.

The framers of the California Constitution sought to restrict their fellow Californians' zeal for devising novel and torturous punishments.[26] Our first opinion construing article I, section 6, equated "cruel" with "barbarous." (*State* v. *McCauley, supra,* 15 Cal. 429, 455.) It has been suggested that the English Bill of Rights of 1689, which contained language identical to that of the Eighth Amendment,[27] and was the apparent precursor of similar provisions in most state constitutions, did not prohibit cruel, barbarous, or torturous punishments, but only excessive or illegal punishments.[28] It is clear, however, that in this country the phrase was understood to encompass the former and to prohibit both new forms of

---

[26]See footnotes 17 and 18, *supra.*

[27]1 Schwartz, The Bill of Rights: A Documentary History (1971) 41-43 (hereinafter "Schwartz").

[28]Granucci, *"Nor Cruel and Unusual Punishments Inflicted:" The Original Meaning* (1969) 57 Cal.L.Rev. 839.

physical cruelty and existing punishments which courts might later hold to be cruel. Delegates to the various state conventions called to ratify the federal Constitution expressed concern that it contained no provision to ban "tortures, or cruel and barbarous punishments,"[29] or "cruel and un-heard-of punishments."[30] At least one congressman, Samuel Livermore of New Hampshire, recognized that the proposed Bill of Rights might result in some existing punishments being outlawed. During the 1789 debates in the House of Representatives he questioned the cruel and unusual punishments clause on the ground that: "villains often deserve whipping, and perhaps even having their ears cut off; but are we in the future to be prevented from inflicting these punishments because they are cruel?"[31]

█ We are mindful, too, that article I, section 6, like the Eighth Amendment, is not a static document. Judgments of the nineteenth century as to what constitutes cruelty cannot bind us in considering this question any more than eighteenth century concepts limit application of the Eighth Amendment. The United States Supreme Court recognized that the Eighth Amendment might be interpreted progressively when it said in *Weems* v. *United States, supra,* 217 U.S. 349, 378 [54 L.Ed. 793, 803], that: "The clause of the Constitution, in the opinion of the learned commentators, may be therefore progressive, and is not fastened to the obsolete, but may acquire meaning as public opinion becomes enlightened by a humane justice." And a plurality of the court implemented that suggestion in *Trop* v. *Dulles, supra,* 356 U.S. 86, 101 [2 L.Ed.2d 630, 642], when it adopted as the measure of acceptable punishment under the Eighth Amendment "the evolving standards of decency that mark the progress of a maturing society." (See also, *Robinson* v. *California* (1962) 370 U.S. 660, 666 [8 L.Ed.2d 758, 762, 82 S.Ct. 1417].)

Were the standards of another age the constitutional measure of "cruelty" today, whipping, branding, pillorying, severing or nailing ears, and boring of the tongue, all of which were once practiced as forms of punishment in this country, might escape constitutional proscription, but none today

---

[29]Patrick Henry in the Virginia Ratifying Convention, 1788, in 2 Schwartz, *supra,* at page 799. "What has distinguished our ancestors?—That they would not admit of tortures, or cruel and barbarous punishment. But Congress may introduce the practice of the civil law, in preference to that of the common law. They may introduce the practice of . . . torturing, to extort a confession of the crime. . . . We are then lost and undone."

[30]Massachusetts Convention Debates, 1788, in 2 Schwartz, *supra,* at pages 690-691. "They are nowhere restrained from inventing the most cruel and unheard-of punishments, and annexing them to crimes; and there is no constitutional check on them, but that racks and gibbets may be amongst the most mild instruments of their discipline."

[31]2 Schwartz, *supra,* pages 1053, 1112.

would argue that they are not "cruel" punishments. Thus, although respondent argues that the standard of cruelty today is no different from what it was when article I, section 6, was adopted, our responsibility demands that we must construe that provision in accordance with contemporary standards. We have recognized before that our Constitution is a progressive document (*People* v. *Western Air Lines, Inc., supra,* 42 Cal.2d 621, 635) and, in the context of article I, section 6, have accepted the *Trop* formulation of "evolving standards of decency that mark the progress of a maturing society" (*People* v. *Clark* (1970) 3 Cal.3d 97, 99 [89 Cal.Rptr. 253, 473 P.2d 997]) as an appropriate expression of the applicable standard. In reality, however, we think the dispute as to the standard to be more apparent than real for the standard today is the standard of 1849 and 1879—whether the punishment affronts contemporary standards of decency. The framers of our Constitution, like those who drafted the Bill of Rights, anticipated that interpretation of the cruel or unusual punishments clause would not be static but that the clause would be applied consistently with the standards of the age in which the questioned punishment was sought to be inflicted.[32]

Respondent also contends, however, that capital punishment does not offend contemporary standards of decency. The People find evidence that it does not do so in public opinion polls, in the willingness of juries to impose the death penalty, and in the statutes of the 41 states which contain provisions for the punishment of death.[33] Public acceptance of capital punishment is a relevant but not controlling factor in assessing whether it is consonant with contemporary standards of decency. But public acceptance cannot be measured by the existence of death penalty statutes or by the fact that some juries impose death on criminal defendants. Nor are public opinion polls about a process which is far removed from the experience of those responding helpful in determining whether capital punishment would be acceptable to an informed public were it evenhandedly applied to a substantial proportion of the persons potentially subject to execution. Although death penalty statutes do remain on the books of many jurisdictions, and public opinion polls show opinion to be divided as to capital punishment as an abstract proposition, the infrequency of its actual application suggests that among those persons called upon to actually impose or carry out the death penalty it is being repudiated with ever increasing frequency. This repudiation has become so apparent

---

[32]See footnote 18, *supra*.

[33]Alaska, Hawaii, Iowa, Maine, Michigan, Minnesota, Oregon, West Virginia, and Wisconsin have abolished capital punishment. United States Department of Justice, Bureau of Prisons, National Prisoner Statistics, Bulletin No. 45 (August 1969) *Capital Punishment 1930–1968* page 30 (hereinafter "NPS Bulletin No. 45").

that the National Crime Commission reported to the President that: "The most salient characteristic of capital punishment is that it is infrequently applied. . . . [A]ll available data indicate that judges, juries, and governors are becoming increasingly reluctant to impose, or authorize the carrying out of a death sentence. . . . In a few states in which the penalty exists on the statute books, there has not been an execution in decades." (President's Commission on Law Enforcement and Administration of Justice, Report (1967) (The Challenge of Crime in a Free Society) p. 143.)

What our society does in actuality belies what it says with regard to its acceptance of capital punishment. Between 1930 and 1968, a total of 3,859 persons were executed in the United States as punishment for crimes ranging from murder to burglary and aggravated assault.[34] The steady decrease in the number of executions from a high of 199 in 1935 to 2 in 1967,[35] in spite of a growing population and notwithstanding the statutory sanction of the death penalty, persuasively demonstrates that capital punishment is unacceptable to society today.

The cruelty of capital punishment lies not only in the execution itself and the pain incident thereto,[36] but also in the dehumanizing effects of the lengthy imprisonment prior to execution during which the judicial and administrative procedures essential to due process of law are carried out.[37] Penologists and medical experts agree that the process of carrying out a verdict of death is often so degrading and brutalizing to the human spirit as to constitute psychological torture.[38] Respondent concedes the fact of

---

[34]NPS Bulletin No. 45, *supra,* page 7.

[35]*Ibid.*

[36]See, Comment, *The Death Penalty Cases,* 56 Cal.L.Rev. 1268, 1341, *supra;* Hearings on Senate Bill 1760 Before the Subcommittee on Criminal Laws and Procedures of the Senate Committee on the Judiciary on March 20, 21 and July 2, 1968 (Published by G.P.O. 1970) page 21.

[37]The median elapsed time prisoners now awaiting execution in California had been imprisoned as of the end of 1968 was 20.7 months. The national median elapsed time was then 33.3 months. The California figures do not take into account prisoners who were awaiting execution at that time but who have since had their sentences commuted, judgments reversed, or have been removed from death row for other reasons. As of December 31, 1968, the median elapsed time condemned prisoners then on death row had been awaiting execution was 23.7 months. (NPS Bulletin No. 45, *supra,* p. 27.) There were a total of 104 persons under sentence of death in California as of December 31, 1971. Of these, two prisoners have been on death row since 1964, five since 1965, and seven since 1966. Eight were received there in 1967, fifteen in 1968, and thirteen in 1969. Thirty-four were received in 1970 and the remaining twenty in 1971.

[38]See e.g., Hearings on Senate Bill 1, before the California Senate Committee on the Judiciary (1960) page 9 (1 Sen. J. Appendix (1961)); Hearings on Senate Bill 1760 Before the Subcommittee on Criminal Laws and Procedures of the Senate Committee on the Judiciary on March 20, 21 and July 2, 1968 (Published by G.P.O. 1760 Before the Subcommittee on Criminal Laws and Procedures of the Senate Comzine (No. 2) 84.

lengthy delays between the pronouncement of the judgment of death and the actual execution, but suggests that these delays are acceptable because they often occur at the instance of the condemned prisoner. We reject this suggestion. An appellant's insistence on receiving the benefits of appellate review of the judgment condemning him to death does not render the lengthy period of impending execution any less torturous or exempt such cruelty from constitutional proscription.

The brutalizing psychological effects of impending execution are a relevant consideration in our assessment of the cruelty of capital punishment. The United States Supreme Court recognized in *Weems* v. *United States, supra,* 217 U.S. 349 at page 372 [54 L.Ed. 793 at pp. 800-801], that "it must have come to [the framers of the Eighth Amendment] that there could be exercises of cruelty by laws other than those which inflicted bodily pain or mutilation." In *Trop* v. *Dulles, supra,* 356 U.S. 86, in which the United States Supreme Court squarely held a criminal punishment to be violative of the Eighth Amendment, the psychological impact of the punishment was dispositive. The court there held that denationalization as punishment was barred by the Eighth Amendment, stating in the plurality opinion: "There may be involved no physical mistreatment, no primitive torture. There is instead the total destruction of the individual's status in organized society. It is a form of punishment more primitive than torture, for it destroys for the individual the political existence that was centuries in the development. The punishment strips the citizen of his status in the national and international political community. His very existence is at the sufferance of the country in which he happens to find himself. . . . In short, the expatriate has lost the right to have rights.

"This punishment is offensive to the cardinal principles for which the Constitution stands. It subjects the individual to a fate of ever-increasing fear and distress. . . . It is no answer to suggest that all the disastrous consequences of this fate may not be brought to bear on a stateless person. The threat makes the punishment obnoxious." (356 U.S. at pp. 101-102 [2 L.Ed.2d at p. 643].)

Although the court suggested in dictum that it believed the death penalty to be permissible then in certain circumstances, it also emphasized that: "The basic concept underlying the Eighth Amendment is nothing less than the dignity of man." (*Id.* at p. 100 [2 L.Ed.2d at p. 642].) The dignity of man, the individual and the society as a whole, is today demeaned by our continued practice of capital punishment. Judged by contemporary standards of decency, capital punishment is impermissibly cruel. It is being increasingly rejected by society and is now almost wholly repudiated

by those most familiar with its processes. Measured by the "evolving standards of decency that mark the progress of a maturing society," capital punishment is, therefore, cruel within the meaning of article I, section 6, of the California Constitution.

### 2. The Unnecessary Cruelty of Capital Punishment

 The People concede that capital punishment is cruel to the individual involved. They argue, however, that only "unnecessary" cruelty is constitutionally proscribed, and that if a cruel punishment can be justified it is not forbidden by article I, section 6, of the California Constitution. We need not decide here whether our Constitution permits the infliction of "necessary" cruelty as punishment for crime, because respondent has not demonstrated that the death penalty can be justified as necessary to any state interest.

In seeking to justify continuance of capital punishment, the People argue that it furthers three of the four acknowledged purposes of punishment. Respondent concedes that death is in no way rehabilitative, but contends that capital punishment may be legitimately imposed in retribution for serious offenses, that it serves to isolate the offender, and that the existence of the death penalty acts as a deterrent to crime. None of these purposes is shown to justify so onerous a penalty as death.

 Although vengence or retribution has been acknowledged as a permissible purpose of punishment under the Eighth Amendment (*Williams* v. *New York* (1949) 337 U.S. 241, 248 [93 L.Ed. 1337, 1343, 69 S.Ct. 1079]), we do not sanction punishment solely for retribution in California. (*In re Estrada* (1965) 63 Cal.2d 740, 745 [48 Cal.Rptr. 172, 408 P.2d 948].) We are fully aware that many condemned prisoners have committed crimes of the utmost cruelty and depravity and that such persons are not entitled to the slightest sympathy from society in the administration of justice or otherwise. Nevertheless, it is incompatible with the dignity of an enlightened society to attempt to justify the taking of life for purposes of vengeance.

 Admittedly, isolation of the offender from society is a proper and often necessary goal of punishment and death does effectively serve that purpose. Society can be protected from convicted criminals, however, by far less onerous means than execution. In no sense can capital punishment be justified as "necessary" to isolate the offender from society.

 Respondent contends that the existence of the death penalty may

deter some persons from committing capital offenses. We have recognized that whether a substantial deterrent effect can be proven is a vigorously disputed proposition. (*People* v. *Love* (1961) 56 Cal.2d 720, 731 [16 Cal. Rptr. 777, 17 Cal.Rptr. 481, 366 P.2d 33, 809]; *People* v. *Ketchel* (1963) 59 Cal.2d 503, 538-539 [30 Cal.Rptr. 538, 381 P.2d 394].)[39] We are aware of the obvious imponderable and variable characteristics of society which can cause statistical studies of deterrence to be misleading, and of the difficulties inherent in attempting to establish that an offense was not committed because a would-be offender was aware of and restrained by the possibility of the death penalty. Nonetheless, as respondent concedes, many homicides in particular are not deterrable and as to the remainder capital punishment can have a significant deterrent effect only if the punishment is swiftly and certainly exacted. We have already demonstrated that the punishment is not swift. Moreover, it is far from certain.

In California death is authorized as the penalty for eight offenses: treason (Pen. Code, § 37), perjury in capital cases (Pen. Code, § 128), first degree murder (Pen. Code, § 190), kidnaping for ransom or robbery with bodily harm to the victim (Pen. Code, § 209), train wrecking (Pen. Code, § 219), malicious assault by life prisoner (Pen. Code, § 4500), explosion of destructive devices causing great bodily injury (Pen. Code, § 12310), and sabotage resulting in death or great bodily injury (Mil. & Vet. Code, § 1672, subd. (a)). The penalty is mandatory for the treason and perjury offenses and for malicious assault by a life prisoner if a non-inmate victim dies. It is discretionary for the other listed offenses.

Notwithstanding the discretion given to judges and juries to impose either death or life imprisonment for first degree murder,[40] it is estimated that in

---

[39]See, e.g., European Commission on Crime Problems, Council of Europe, The Death Penalty in European Countries (1962) pages 45-46; Massachusetts Special Commission Established for the Purpose of Investigating and Studying the Abolition of the Death Penalty in Capital Cases, House Report No. 2575 (1958) at page 44; Ohio Legislative Service Commission, Capital Punishment, Staff Report No. 46 (1961) at pages 43-47; Royal Commission on Capital Punishment, Report (1953) paragraph 65, at page 23; Subcommittee of the Judiciary Committee on Capital Punishment, Problems of the Death Penalty and its Administration in California, 20 Assembly Interim Committee Report No. 3 (1955-1957) at pages 27-30; Bedau, *The Question of Deterrence*, in The Death Penalty in America 264-265 (H. Bedau ed. 1964 [hereinafter "Bedau"]); Graves, *The Deterrent Effect of Capital Punishment in California*, in Bedau, *supra*, at page 322; Savitz, *The Deterrent Effect of Capital Punishment in Philadelphia*, in Bedau, *supra*, at page 315; Schuessler, *The Deterrent Influence of the Death Penalty* (1952) 284 Annals 54, 62; Sellin, *Homicides in Retentionist and Abolitionist States*, in Capital Punishment 135 (T. Sellin ed. 1967 [hereinafter "Sellin"]).

[40]The death penalty may not be imposed on persons who were under 18 years of age at the time of the offense. (Pen. Code, § 190.1.)

California 80 percent of those persons convicted receive a sentence of life imprisonment.[41] Of the 20 percent upon whom a sentence of death is imposed, commutation of sentence, reversal of the judgment, and other factors[42] further reduce the number of defendants actually executed to the point where, far from being a certain penalty with acknowledged deterrent effect, capital punishment today is rarely imposed or implemented.

A punishment as extreme and as irrevocable as death cannot be predicated upon speculation as to what the deterrent effect might be if it were actually applied swiftly and with certainty upon all who were potentially subject to it. As stated previously, in reality today it is neither swift nor certain. Respondent offers us no basis upon which to conclude that, as presently administered, capital punishment is any greater deterrent to crime than are other available forms of punishment.

### 3. *Capital Punishment is an Unusual Punishment*

We have already noted that the death sentence is rarely imposed in California today and that it is even more rarely carried out. But even adopting the broader test of widespread acceptance among civilized peoples, capital punishment can no longer withstand constitutional proscription. Respondent seeks to avoid this conclusion by suggesting that a punishment is not unusual in the constitutional sense unless it is unusual as to form, or method by which it is imposed. We cannot accept this limitation of the meaning of "unusual," however, for to do so would ignore the fact that execution is a form or method of punishment and would embroil us in fu-

---

[41]McGee, *Capital Punishment as Seen by a Correctional Administrator* (1964) 28 Fed. Prob. (No. 2) 11, 12. In 1967 there were 88 first degree murder convictions in California and 17 death sentences. (Crime & Delinquency in Cal. 1967 (Bureau of Crim. Statistics Rep. 1968) p. 140; NPS Bulletin No. 42 (1968).) During 1969 there were 87 first degree murder convictions and 8 death sentences. (Crime & Delinquency in Cal. 1969 (Bureau of Crim. Statistics Rep. 1970) p. 121.) The ratio of death sentences to first degree murder convictions does not adequately reflect the uncertainty of imposition of capital punishment, however. This uncertainty is better exemplified by the rarity of the death sentence in California in relation to the total number of wilful homicides. In 1969 California experienced a record 1,376 wilful homicides. (Crime and Delinquency in Cal. 1970 (Bureau of Crim. Statistics Rep. 1971) p. 5.) In 1970 there were 1,359 wilful homicides. (*Ibid.*) There were 1,790 arrests in 1969 and 1,807 arrests in 1970 for all categories of homicide. (Crime & Delinquency in Cal.—Crime and Arrests 1970 (Reference Tables, Bureau of Crim. Statistics 1971) p. 5.) Yet, in all of 1969, 1970 and 1971 a total of only 67 persons were sentenced to death.

[42]Death from natural causes, suicide, and insanity (Pen. Code, § 3704). During the period 1965-1971, 60 percent or 66 death penalty appeals resulted in reversals of the entire judgment or of the penalty. In addition, 19 extraordinary writs were granted setting aside the penalty or the entire conviction and requiring new trials or further proceedings for each defendant.

ture semantic disputes as to whether innovative types of punishment were unconstitutionally "unusual" forms of punishment.

In construing article I, section 6, we have held than an excessive or disproportionate punishment is "unusual." (*People* v. *Oppenheimer, supra,* 156 Cal. 733, 737-738.) When a punishment has been challenged as being unconstitutionally "cruel," however, the fact that it was not literally "unusual" has been considered relevant, not to whether the punishment should be proscribed as excessive, but as to whether it was offensive to the standards of decency common to civilized peoples. (*In re Finley, supra,* 1 Cal. App. 198, 202.) Thus, when doubt existed as to whether a punishment was so cruel as to contravene article I, section 6, that doubt could be resolved in favor of upholding the punishment if it was commonly accepted among civilized societies not limited to our own.

We have concluded that capital punishment is unconstitutionally cruel and that under article I, section 6, a cruel punishment is proscribed irrespective of whether it is excessive. If any doubt remained as to its cruelty, however, we could no longer uphold capital punishment on the ground that it is commonly accepted, for the repudiation of the death penalty in this country is reflected in a world-wide trend towards abolition.

Not only have nine states, Puerto Rico and the Virgin Islands totally abolished capital punishment, but New Mexico, New York, North Dakota, Rhode Island and Vermont have limited its application to exceptional circumstances. Among those American jurisdictions which permit it at all, 14 have not conducted an execution since 1960, 19 have had none since 1961, 24 have had none since 1962, 30 have had none since 1963, and 35 have had none since 1964. In 1967 California and Colorado each executed one person. Prior to 1967 California had not had an execution since 1963 when one person was executed.[43] The increasingly unusual nature of capital punishment in the United States is readily apparent in the following chart:

*Total Number of Executions in the United States*

| | |
|---|---|
| 1930—155 | 1963—21 |
| 1935—199 | 1964—15 |
| 1940—124 | 1965— 7 |
| 1945—117 | 1966— 1 |
| 1950— 82 | 1967— 2 |
| 1955— 76 | 1968— 0 |
| 1960— 56 | 1969— 0 |
| 1961— 42 | 1970— 0 |
| 1962— 47 | 1971— 0 |

[43]NPS Bulletin No. 45, *supra,* pages 8-9.

The observation of the National Crime Commission that the infrequency of its application is the most salient characteristic of capital punishment in the United States is echoed in the report of the Secretary General of the United Nations on the world-wide status of capital punishment. "There is still a clear trend toward total abolition. Most countries are gradually restricting the number of offenses for which the death penalty can be applied and a few have totally abolished capital offenses even in wartime. Those countries retaining the death penalty report that in practice it is only exceptionally applied and frequently the persons condemned are later pardoned by executive authority. . . ." (United Nations, Economic and Social Council. Note by the Secretary General, Capital Punishment (E/4947) (February 23, 1971) p. 3.) Defendant has prepared the following table demonstrating the extent of de jure and de facto abolition of capital punishment in foreign jurisdictions:[44]

*Worldwide Abolition*

| | | | |
|---|---|---|---|
| Argentina | 1922 | Costa Rica | 1880 |
| Australia (Federal) | 1945 | Denmark | 1930 |
| New South Wales | 1955 | Dominican Republic | 1924 |
| Queensland | 1922 | Ecuador | 1897 |
| Tasmania | 1968 | Finland | 1949 |
| Austria | 1968 | Germany, West | 1949 |
| Belgium | 1863 | Greenland | 1954 |
| Bolivia | 1961 | Honduras | 1957 |
| Brazil | 1946 | Iceland | 1940 |
| Canada | 1967 | India | |
| Colombia | 1910 | Travancore | 1944 |

[44]Sources for this table are: United Nations, Secretary-General's Note, *supra*; Ancel, The Death Penalty in European Countries (Council of Europe, European Committee on Crime Problems 1962); Joyce, Capital Punishment: A World View (1961); University of Coimbra, Faculty of Law, Pena do Morte (1967); Patrick, *The Status of Capital Punishment: A World Perspective* (1965) 56 J. Crim. L.C. & P.S. 397, 405. Included among the abolitionist jurisdictions are nine which retained capital punishment for certain extraordinary civil offenses (Canada, Israel, Nepal, New Zealand, the United Kingdom, and the Australian jurisdictions); eight which permit it under military law or in wartime (Brazil, Denmark, Finland, Italy, Netherlands, Norway, Sweden, and Switzerland), of which two executed Nazi collaborators after the Second World War (Netherlands and Norway). Belgium executed one soldier in 1918.

The dates shown are those of de jure abolition except for Liechtenstein, Luxembourg, Nicaragua, and Surinam, in which the date represents that of the last execution and the beginning of de facto abolition, with the exception of Luxembourg which had one later execution.

The Canadian statute abolishing capital punishment for murder expires five years from the date of its enactment if not renewed.

*Worldwide Abolition—Continued*

| | | | |
|---|---|---|---|
| Israel | 1954 | Norway | 1905 |
| Italy | 1944 | Panama | 1915 |
| Liechtenstein | 1798 | Portugal | 1867 |
| Luxembourg | 1821 | San Marino | 1848 |
| Mexico (Federal) | 1931 | Surinam | 1927 |
| 29 of 32 states | 1931–1970 | Sweden | 1921 |
| Monaco | 1962 | Switzerland | 1942 |
| Mozambique | 1867 | United Kingdom | |
| Nepal | 1950 | Great Britain | 1965 |
| Netherlands | 1886 | Northern Ireland | 1966 |
| Antilles | 1957 | Uruguay | 1907 |
| New Zealand | 1961 | Vatican City State | 1969 |
| Nicaragua | 1892 | Venezuela | 1863 |

No longer can it be said that capital punishment is not "cruel *per se,* for the whole current of law for centuries justifies its infliction." (*In re Finley, supra,* 1 Cal.App. 198, 202.) Although world-wide acceptance of capital punishment at the turn of the century may then have warranted resolving doubts as to its cruelty in favor of its constitutionality, the current has now reversed. It is now, literally, an unusual punishment among civilized nations.

### Conclusion

We have concluded that capital punishment is impermissibly cruel. It degrades and dehumanizes all who participate in its processes. It is unnecessary to any legitimate goal of the state and is incompatible with the dignity of man and the judicial process. Our conclusion that the death penalty may no longer be exacted in California consistently with article I, section 6, of our Constitution is not grounded in sympathy for those who would commit crimes of violence, but in concern for the society that diminishes itself whenever it takes the life of one of its members. Lord Chancellor Gardiner reminded the House of Lords, debating abolition of capital punishment in England: "When we abolished the punishment for treason that you should be hanged, and then cut down while still alive, and then disembowelled while still alive, and then quartered, we did not abolish that punishment because we sympathised with traitors, but because we took the view that it was a punishment no longer consistent with our self respect." (268 Hansard, Parliamentary Debates (5th Series) Lords, 43d Parl., First Sess., 1964-1965 (1965) p. 703.)

▆▆▆ Insofar as Penal Code sections 190 and 190.1 purport to authorize

the imposition of the death penalty, they are, accordingly, unconstitutional. In view of our decision that the death penalty may not be carried out, it is unnecessary to reach petitioner's other contentions relating to the validity of the penalty judgment.

██ ██ ██ The judgment, insofar as it provides for the penalty of death, is modified to provide a punishment of life imprisonment and as so modified is affirmed in all other respects.[45]

Peters, J., Tobriner, J., Mosk, J., Burke, J., and Sullivan, J., concurred.

**McCOMB, J.**—I do not concur in this court's judgment, but would affirm the ruling of the trial court, for these reasons:

*First:* The question here involved is now pending before the Supreme Court of the United States, whose decision will be binding upon this court. Therefore, I would not pass upon the merits of the contentions discussed in the foregoing opinion until the decision of the Supreme Court of the United States has been rendered.

*Second:* In my opinion, the death penalty is constitutional, as held by this court in a long line of cases, including the following decisions handed down within the past three and a half years: (*People* v. *St. Martin,* 1 Cal.3d 524, 538-539 [19, 20] [83 Cal.Rptr. 166, 463 P.2d 390]; *In re Hill,* 71 Cal.2d 997, 1020 [11] [80 Cal.Rptr. 537, 458 P.2d 449]; *People* v. *Wil-*

---

[45]Inasmuch as today's decision is fully retroactive, any prisoner now under a sentence of death, the judgment as to which is final, may file a petition for writ of habeas corpus in the superior court inviting that court to modify its judgment to provide for the appropriate alternative punishment of life imprisonment or life imprisonment without possibility of parole specified by statute for the crime for which he was sentenced to death. Petitions should be filed in the court of territorial jurisdiction in the first instance and transferred by that court to the sentencing court in the event the court with territorial jurisdiction was not the sentencing court.

The issue of the right to bail in cases in which the law has heretofore provided for the death penalty has been raised for the first time by the People and amici curiae on petition for rehearing. Although this question was never an issue in this case, we deem it appropriate to note that article I, section 6, of the California Constitution and section 1270 of the Penal Code, dealing with the subject of bail, refer to a category of offenses for which the punishment of death could be imposed and bail should be denied under certain circumstances. The law thus determined the gravity of such offenses both for the purpose of fixing bail before trial and for imposing punishment after conviction. Those offenses, of course, remain the same but under the decision in this case punishment by death cannot constitutionally be exacted. The underlying gravity of those offenses endures and the determination of their gravity for the purpose of bail continues unaffected by this decision. Accordingly, to subserve such purpose and subject to our future consideration of this issue in an appropriate proceeding, we hold that they remain as offenses for which bail should be denied in conformity with article I, section 6, of the Constitution and Penal Code section 1270 when the proof of guilt is evident or the presumption thereof great.

liams, 71 Cal.2d 614, 634 [23] [79 Cal.Rptr. 65, 456 P.2d 633]; *People* v. *Pike,* 71 Cal.2d 595, 604 [8] [78 Cal.Rptr. 672, 455 P.2d 776]; *People* v. *Quicke,* 71 Cal.2d 502, 523 [20] [78 Cal.Rptr. 683, 455 P.2d 787]; *People* v. *Mabry,* 71 Cal.2d 430, 444 [15] [78 Cal.Rptr. 655, 455 P.2d 759]; *People* v. *Vaughn,* 71 Cal.2d 406, 418 [5] [78 Cal.Rptr. 186, 455 P.2d 122]; *People* v. *Nye,* 71 Cal.2d 356, 377 [20] [78 Cal.Rptr. 467, 455 P.2d 395]; *In re Arguello,* 71 Cal.2d 13, 16 [76 Cal.Rptr. 633, 452 P.2d 921]; *People* v. *Hill,* 70 Cal.2d 678, 700-701 [76 Cal.Rptr. 225, 452 P.2d 329]; *In re Anderson,* 69 Cal.2d 613, 629-632 [73 Cal.Rptr. 21, 447 P.2d 117].)[1]

*Third:* Further, the death penalty serves a useful purpose as a deterrent of crimes which result in the death of innocent victims and should therefore not be abolished.[2] An article entitled "A Wistful Goodbye to Capital Punishment" by Donald Atwell Zoll, Professor of Political Science at Arizona State University, published in the December 3, 1971, issue of *National Review* at pages 1351-1354, convincingly states the reasons it would be wise to retain the death penalty.[3]

---

[1]In my opinion, the fact that for thousands of years death has been accepted as a proper punishment for the most serious criminal offenses indicates that it is neither a cruel punishment (when effected by means such as those used in this state) nor an unusual punishment.

In the Holy Bible, it is stated: "Whoso sheddeth man's blood, by man shall his blood be shed: for in the image of God made he man." (Genesis, ch. 9, v. 6.) The foregoing quotation shows that the death penalty has long been regarded by us and our predecessors as an appropriate punishment for a person who commits murder.

[2]The Honorable B. Rey Schauer, Justice of the Supreme Court of California, has said: "That the ever present potentiality in California of the death penalty, for murder in the commission of armed robbery, each year saves the lives of scores, if not hundreds of victims of such crimes, cannot I think, reasonably be doubted by any judge who has had substantial experience at the trial court level with the handling of such persons. I know that during my own trial court experience, which although not extensive in criminal law, included some four to five years (1930-1934) in a department of the superior court exclusively engaged in handling felony cases, I repeatedly heard from the lips of robbers—some amateurs (no prior convictions), some professionals (with priors)—substantially the same story: 'I used a toy gun [or a simulated gun or a gun in which the firing pin or hammer had been extracted or damaged] because I didn't want my neck stretched.' (The penalty, at the time referred to, was hanging; death by lethal gas was substituted in 1941.)" (*People* v. *Love,* 56 Cal.2d 720, 739, at p. 744 fns. omitted [16 Cal.Rptr. 777, 17 Cal.Rptr. 481, 366 P.2d 33].)

[3]As aptly pointed out by Professor Zoll in the conclusion of his article: "Capital punishment ought not to be abolished solely because it is substantially repulsive, if infinitely less repulsive than the acts which invoke it. Yet the mounting zeal for its abolition seems to arise from a sentimentalized hyperfastidiousness that seeks to expunge from the society all that appears harsh and suppressive. If we are to preserve the humane society we will have to retain sufficient strength of character and will to do the unpleasant in order that tranquility and civility may rule comprehensively. It seems very likely that capital punishment is a . . . necessary, if limited, factor in that maintenance of social tranquility and ought to be retained on this ground.

*Fourth*: Subject to constitutional limitations, the Legislature has the power to prescribe punishment for crime. (*People* v. *Bauer,* 1 Cal.3d 368, 375 [7] [82 Cal.Rptr. 357, 461 P.2d 637, 37 A.L.R.3d 1398]; *In re Anderson, supra,* 69 Cal.2d 613, 630-631 [8].) As hereinabove indicated, it is my opinion that the death penalty is constitutional, as determined by this court in innumerable cases. Therefore, since it is the duty of the Legislature or the electorate, and not the judiciary, to decide whether it is sound public policy to empower the imposing of the death penalty, it is my opinion that if a change is to be made, it should be effected through the legislative process or by the people through the initiative process. (See *In re Anderson, supra,* 69 Cal.2d 613, 616, 632 [10]; *People* v. *Tanner,* 3 Cal.2d 279, 298 [44 P.2d 324].)

Respondent's petition for a rehearing was denied March 17, 1972, and the opinion was modified to read as printed above. McComb, J., was of the opinion that the petition should be granted.

To do otherwise is to indulge in the luxury of permitting a sense of false delicacy to reign over the necessity of social survival."