# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number: 2018-NMSC-030

Filing Date: April 23, 2018

Docket No. S-1-SC-36395

STATE OF NEW MEXICO,

       Plaintiff-Appellee,

v.

MUHAMMAD AMEER,

       Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Christina P. Argyres and Charles W. Brown, District Judges**

Bennett J. Baur, Chief Public Defender
Scott Wisniewski, Assistant Public Defender
Matthias Swonger, Assistant Public Defender
Albuquerque, NM

for Appellant

Hector H. Balderas, Attorney General
Maris Veidemanis, Assistant Attorney General
Santa Fe, NM

for Appellee

## OPINION

**DANIELS, Justice.**

**{1}** Since New Mexico became a state over a hundred years ago, Article II, Section 13 of the New Mexico Constitution has contained a clause providing that "[a]ll persons shall, before conviction, be bailable by sufficient sureties, except for capital offenses when the proof is evident or the presumption great . . . ."

**{2}** In 2009, the legislative and executive branches statutorily abolished the penalty of

1

capital punishment for first-degree murder, the only remaining New Mexico crime carrying a potential death sentence, for all offenses committed after July 1, 2009. *See* NMSA 1978, § 31-18-14 (2009); NMSA 1978 § 31-18-23 (2009); NMSA 1978, § 31-20A-2 (2009).

**{3}**     Defendant Muhammad Ameer is charged with first-degree murder committed on or after July 1, 2009. In this appeal from a district court order applying the capital offense exception to the constitutional right to bail and denying Defendant any form of pretrial release, we hold that first-degree murder is not currently a constitutionally defined capital offense in New Mexico that would authorize a judge to categorically deny release pending trial.

**{4}**     Following briefing and oral argument, we issued a bench ruling and written order reversing the district court's detention order that had been based solely on the capital offense exception. *See* Order, *State v. Ameer*, S-1-SC-36395 (May 8, 2017). In the same order we remanded with instructions to the district court to consider the State's unaddressed request for detention under the 2016 amendment to Article II, Section 13 of the New Mexico Constitution, allowing courts a new and broader evidence-based authority to deny pretrial release for any felony defendant "if the prosecuting authority . . . proves by clear and convincing evidence that no release conditions will reasonably protect the safety of any other person or the community." N.M. Const. art. II, § 13. We also advised that this precedential opinion would follow.

## I.     BACKGROUND

**{5}**     Defendant was indicted for, among other offenses, first-degree murder in violation of NMSA 1978, Section 30-2-1(A) (1994), an offense that had been statutorily defined as a "capital felony" before capital punishment was abolished in July 2009 and which is still statutorily referred to by that term, although it now carries a maximum penalty of life imprisonment instead of a death sentence for offenses committed on or after July 1, 2009. *See* § 31-20A-2. The date of Defendant's alleged offense was March 19, 2017, and his alleged crime therefore cannot result in capital punishment.

**{6}**     The State moved to detain Defendant pending trial under the new detention authority provided by the November 2016 amendment to Article II, Section 13 in felony cases where "no release conditions will reasonably protect the safety" of others. N.M. Const. art. II, § 13 (amendment effective Nov. 8, 2016). But instead of relying on that new authority, the district court ordered Defendant detained on the basis of the older capital offense exception to the constitutional right to pretrial release.

**{7}**     Defendant appealed the pretrial detention order to this Court.

## II.     DISCUSSION

## A.     Jurisdiction and Standard of Review

2

**{8}** The New Mexico Supreme Court is vested with exclusive jurisdiction over interlocutory appeals in criminal cases where a defendant faces possible life imprisonment or execution. *State v. Brown*, 2014-NMSC-038, ¶ 10, 338 P.3d 1276 (citing *State v. Smallwood*, 2007-NMSC-005, ¶ 11, 141 N.M. 178, 152 P.3d 821); *see also* N.M. Const. art. VI, § 2 (granting this Court exclusive jurisdiction over appeals from final district court judgments "imposing a sentence of death or life imprisonment"); NMSA 1978, § 39-3-3(A)(2) (1972) (permitting an appeal from a district court "order denying relief on a petition to review conditions of release"); Rule 12-204 NMRA (providing procedures for interlocutory appeals from orders denying release, effective for all cases pending or filed on or after July 1, 2017).

**{9}** The final responsibility for interpreting the New Mexico Constitution also rests with this Court, "the ultimate arbiter[] of the law of New Mexico." *State ex rel. Serna v. Hodges*, 1976-NMSC-033, ¶ 22, 89 N.M. 351, 552 P.2d 787, *overruled on other grounds by State v. Rondeau*, 1976-NMSC-044, ¶ 9, 89 N.M. 408, 553 P.2d 688. In fulfilling that responsibility, we review all questions of constitutional and statutory interpretation de novo. *State v. Boyse*, 2013-NMSC-024, ¶ 8, 303 P.3d 830. "[O]ur primary goal is to give effect to the intent of the Legislature which proposed [the constitutional provision] and the voters of New Mexico who approved it." *Block v. Vigil-Giron*, 2004-NMSC-003, ¶ 4, 135 N.M. 24, 84 P.3d 72. And we are guided by the principle that "[t]erms used in a [c]onstitution must be taken to mean what they meant to the minds of the voters of the state when the provision was adopted." *Flaska v. State*, 1946-NMSC-035, ¶ 12, 51 N.M. 13, 177 P.2d 174 (internal quotation marks and citation omitted).

**B.     Historical Meaning of "Capital Offense" as a Crime That Is Punishable by Capital Punishment**

**{10}** Since at least the late 1400s, the term "capital" has meant "[a]ffecting, or involving loss of, the head or life," or "[p]unishable by death." *See The Oxford English Dictionary* vol. II (2d ed. 1989) at 862; *see also Black's Law Dictionary* (10th ed. 2014) at 250 (defining "capital" as "[p]unishable by execution; involving the death penalty"). The term derives from the Latin word "caput," meaning head. *Merriam-Webster's Third New International Dictionary of the English Language, Unabridged* (1961) at 332. *See Commonwealth ex rel. Castanaro v. Manley*, 60 Pa. D. & C. 194, 196 (Lackawanna Cty. 1947) ("The words, []'capital offenses', as used in the [Pennsylvania] Constitution clearly mean offenses for which the death penalty may be imposed.").

**{11}** This was the common understanding of capital punishment at the time New Mexico became part of the United States and drafted its constitution to follow the lead of Pennsylvania and most other states, where the capital offense exception to the right of bail had become part of "almost every state constitution adopted after 1776." June Carbone, *Seeing Through the Emperor's New Clothes: Rediscovery of Basic Principles in the Administration of Bail*, 34 Syracuse L. Rev. 517, 531-32 (1983); *Brown*, 2014-NMSC-038, ¶¶ 19, 26.

3

**{12}** A substantial majority of jurisdictions across the country addressing the same constitutional interpretation issue accordingly have held that an offense is a nonbailable capital offense only if it may be punished by imposition of the death penalty. *See Martin v. State*, 517 P.2d 1389, 1394, 1397 (Alaska 1974) (noting that where the constitution authorizes pretrial detention only for capital offenses, "a legislative enactment expressly permitting the detention of persons [charged with noncapital offenses] without right to bail would be unconstitutional unless a constitutional amendment were adopted"); *In re Tarr*, 508 P.2d 728, 729 (Ariz. 1973) ("The United States Supreme Court has abolished the death penalty in statutes like Arizona's . . . and has therefore abolished 'capital offenses' in Arizona."); *Kendrick v. State*, 24 S.W.2d 859, 860 (Ark. 1930) ("[T]he offense charged was a felony, punishable only by imprisonment in the penitentiary, and the accused had the legal right to give bond for his appearance."); *State v. Menillo*, 268 A.2d 667, 668 (Conn. 1970) ("But since the penalty for murder in the first degree could be death, a first-degree murder indictment constitutes an indictment for an offense punishable by death, that is, a capital offense."); *Adams v. State*, 48 So. 219, 224 (Fla. 1908) (in banc) ("A 'capital crime' is one for which the punishment of death is inflicted. The crime of murder in the second degree is punished by imprisonment in the state prison for life, and is not a capital crime."); *Caesar v. State*, 57 S.E. 66, 67 (Ga. 1907) ("If under any circumstances the penalty of death can be inflicted, the offense is capital . . . . If under no circumstances the death penalty can be inflicted, the offense is not capital."); *State v. Jiminez*, 456 P.2d 784, 788 (Idaho 1969) ("[Because] murder in the second degree [is] a crime not punishable by death . . . , [the statute], which provides that capital offenses are not bailable, could not operate automatically to prevent the admission of appellant to bail." (footnote omitted)); *People ex rel. Hemingway v. Elrod*, 322 N.E.2d 837, 840 (Ill. 1975) ("[A] capital case is one in which the death penalty may, but need not necessarily, be inflicted."); *State v. Christensen*, 195 P.2d 592, 596 (Kan. 1948) ("'Capital crime, felony or offense' . . . do[es] not include an offense in which death in no event can be inflicted."); *Duke v. Smith*, 253 S.W.2d 242, 243 (Ky. Ct. App. 1952) ("The accused is entitled to bail as a matter of unqualified right when charged with any criminal offense except one that may be punished by death[, and i]n a capital offense he has such right unless the Commonwealth shall produce . . . evidence sufficient to create great presumption of guilt."); *Fredette v. State*, 428 A.2d 395, 403 (Me. 1981) ("[A]n offense is 'capital' only if it is currently punishable by death; it does not remain 'capital' because at some previous time it had been punishable by death."); *McLaughlin v. Warden of Baltimore City Jail*, 298 A.2d 201, 201 (Md. Ct. Spec. App. 1973) ("As Maryland law presently exists, there is no capital crime because the death penalty is not mandatory."); *Commonwealth v. Ibrahim*, 68 N.E. 231, 232 (Mass. 1903) ("A capital crime is one punishable with the death of the offender."); *State v. Pett*, 92 N.W.2d 205, 207 (Minn. 1958) ("Murder in the first degree is not a capital offense when it cannot be punished by death."); *Ex parte Welsh*, 162 S.W.2d 358, 359 (Mo. Ct. App. 1942) ("A capital offense is one which is punishable—that is to say, liable to punishment—with death."); *Edinger v. Metzger*, 290 N.E.2d 577, 578 (Ohio Ct. App. 1972) ("A 'capital offense' has been uniformly defined as one where death may be imposed."); *Commonwealth v. Truesdale*, 296 A.2d 829, 832 (Pa. 1972) ("[T]he constitutional phrase 'capital offense' is a definition of a penalty, i.e., the death penalty, rather than a definition of the crime."), *superseded by*

4

*constitutional amendment*, Pa. Const. art. 1, § 14 (amended 1998); *City of Sioux Falls v. Marshall*, 204 N.W. 999, 1001 (S.D. 1925) ("By virtue of our constitutional provision . . . , and since the abolition of capital punishment, bail before conviction is a matter of absolute right in all cases."); *Butt v. State*, 175 S.W. 529, 530 (Tenn. 1915) ("[I]n this state, it is competent for . . . this court on appeal, to disregard the finding of mitigating circumstances by the trial jury and to order the infliction of the death penalty. Hence there continues to be involved a 'capital offense' within the meaning of the constitutional provision now under consideration."); *Ex parte Contella*, 485 S.W.2d 910, 912 (Tex. Crim. App. 1972) ("[M]urder, when committed by a person under seventeen years of age, is not a capital offense because the death penalty cannot be imposed in such cases."); *In re Perry*, 19 Wis. 676, 676 (1865) ("[S]ince the abolition of capital punishment in this state, persons charged with murder are in all cases bailable [under the Wisconsin constitutional provision, 'All persons shall, before conviction, be bailable . . . except for capital offenses when the proof is evident or the presumption great.']"); *State v. Crocker*, 40 P. 681, 685 (Wyo. 1895) ("[Because 'a]ll persons shall be bailable by sufficient sureties, except for capital offenses when the proof is evident or the presumption great,' [t]he right to furnish bail with sufficient sureties . . . arises in favor of any person accused of crime, and before conviction, absolutely and without exception in cases of all crimes not punishable with death.").

**{13}**    This view, that crimes are nonbailable capital offenses only when they carry the possibility of imposition of the death penalty on conviction, has been referred to as the *penalty theory*. *See Roll v. Larson*, 516 P.2d 1392, 1393 (Utah 1973). The penalty theory rests on the reasoning that no amount of bail is likely to secure a defendant's voluntary appearance at a trial that may result in a death sentence. *See State v. Johnson*, 294 A.2d 245, 250 (N.J. 1972) ("In a choice between hazarding his life before a jury and forfeiting his or his sureties' property, the framers of the many State Constitutions felt that an accused would probably prefer the latter. But when life was not at stake and consequently the strong flight-urge was not present, the framers obviously regarded the right to bail as imperatively present."); *Ex parte Dennis*, 334 So. 2d 369, 371 (Miss. 1976) ("The prevailing reason for denying bail in capital cases was that pretrial incarceration was necessary for the accused's appearance at trial since it was thought that an accused would forfeit his bond by flight rather than risk death by a jury verdict.").

## C.    The Post-*Furman* Classification Theory

**{14}**    In its opposition to Defendant's appeal in this case, the State argues that a capital offense is not necessarily one punishable by death but is instead a crime so categorically severe that the Legislature may statutorily designate an offense as "capital" and place it in a nonbailable constitutional capital offense category even if capital punishment for the offense has been statutorily abolished. In support, the State asks us to join a minority of jurisdictions that purportedly now follow what has been called a *classification theory*, citing *United States v. Martinez*, 505 F. Supp. 2d 1024, 1027-29, 1033 (D.N.M. 2007); *Tribe v. District Court in & for County of Larimer*, 593 P.2d 1369, 1370-71 (Colo. 1979) (en banc); and *Hudson v. McAdory*, 268 So. 2d 916, 920-22 (Miss. 1972). The State argues that courts

in California, Colorado, Nevada, Mississippi, Louisiana, Washington, Utah, Alabama, Oklahoma, and West Virginia have adopted a classification theory and relies on a brief summary statement to that effect in *Tribe*, 593 P.2d at 1370-71.

**{15}**    But none of those cited cases addressed the issue before us, whether a legislature can abolish capital punishment while still calling penitentiary-only crimes "capital" for the purpose of denying bail under a capital offense exception to a constitutional guarantee of pretrial release. In fact, neither *Tribe* nor *Martinez* involved a pretrial detention issue or any constitutional interpretation at all.

**{16}**    *Martinez* was a federal prosecution for a murder occurring in what is defined in 18 U.S.C. § 1151 (2006, 2012) as "Indian country," and the nonconstitutional issue in the opinion concerned the applicability of a federal statute, 18 U.S.C. § 3281 (1994), providing that no statute of limitations would bar prosecution of "any offense punishable by death." *See Martinez*, 505 F. Supp. 2d at 1025-26. The defendant was indicted for first-degree murder, which is statutorily punishable "by death or by imprisonment for life" under 18 U.S.C. § 1111(b) (1994). *See Martinez*, 505 F. Supp. 2d at 1025-26. The issue in *Martinez* was whether an Indian tribe's exercising its right under 18 U.S.C. § 3598 (1994) to opt out of the federal death penalty made the federal first-degree murder statute no longer an offense "punishable by death" for statute of limitations purposes. *See Martinez*, 505 F. Supp. 2d at 1026-27. *Martinez* cited with approval a line of federal authority holding that whether a crime is considered punishable by death or is a capital offense "depends on whether the death penalty may be imposed for the crime under the enabling statute, not on whether the death penalty is in fact available for defendants in a particular case." *Id.* at 1029 (internal quotation marks and citation omitted). Because Congress had authorized death as a potential sentence for first-degree murder, it had statutorily made the offense a capital offense punishable by death for purposes of statutes of limitations. *See id.* at 1034.

**{17}**    *Tribe* addressed the applicability of a provision of the Colorado Rules of Criminal Procedure requiring that juries be sequestered during trial in a capital case, following judicial invalidation of capital punishment statutorily prescribed for the first-degree murder crime with which the defendant was charged. *See* 593 P.2d at 1370. The Colorado Supreme Court clarified that the question of whether the crime was a capital case depended on whether "the pertinent [s]tatute itself provided that [the] death penalty could be administered under the facts alleged." *Id.* at 1371. Because the Colorado statute still classified first-degree murder as an offense for which capital punishment could be imposed, *see* Colo. Rev. Stat. § 18-1-105(1)(a) (1979 Colo. Sess. Laws at 669), the court held that a prosecution for first-degree murder was a capital case in which jurors had to be sequestered, *see Tribe*, 593 P.2d at 1370-71.

**{18}**    Our research reveals that no case in any jurisdiction, including those referenced in either *Martinez* or *Tribe*, has held that a constitutional provision guaranteeing bail in all but "capital offenses" will permit bail to be denied after a *legislative* abolition of capital punishment for an offense, as has occurred in New Mexico. The cases referenced in *Tribe*

6

dealt with defendants charged under statutes continuing to prescribe capital punishment on their face after the actual imposition of capital punishment had been *judicially* barred in 1972 when the Eighth Amendment holding in *Furman v. Georgia*, 408 U.S. 238, 239 (1972), effectively precluded imposition of the death penalty under all then-existing state capital punishment statutes. Because the State's position relies so heavily on the purported adoption of a classification theory by ten states, we closely examine the law in each of those jurisdictions.

## 1.    California

**{19}**    *People v. Anderson*, 493 P.2d 880, 899 n.45 (Cal. 1972), *superseded by constitutional amendment*, Cal. Const. art. I, § 27 (amended 1972, *see* 1972 Cal. Stat. at A-17), was cited by *Tribe*, 593 P.2d at 1371, in support of the capital-offense classification theory. The first expression in American jurisprudence of the theory appeared in a footnote in *Anderson*, 493 P.2d at 899 n.45. After holding that California's death penalty statutes violated the cruel and unusual punishment clause of the California Constitution, the California Supreme Court added a brief footnote, without the citation of any precedent in California or any other jurisdiction and without any further explanation:

> The issue of the right to bail in cases in which the law has heretofore provided for the death penalty has been raised for the first time by the People and amici curiae on petition for rehearing. Although this question was never an issue in this case, we deem it appropriate to note that article I, section 6, of the California Constitution and section 1270 of the Penal Code, dealing with the subject of bail, refer to a category of offenses for which the punishment of death could be imposed and bail should be denied under certain circumstances. The law thus determined the gravity of such offenses both for the purpose of fixing bail before trial and for imposing punishment after conviction. Those offenses, of course, remain the same but under the decision in this case punishment by death cannot constitutionally be exacted. The underlying gravity of those offenses endures and the determination of their gravity for the purpose of bail continues unaffected by this decision. Accordingly, to subserve such purpose and subject to our future consideration of this issue in an appropriate proceeding, we hold that they remain as offenses for which bail should be denied in conformity with article I, section 6, of the Constitution and Penal Code section 1270 when the proof of guilt is evident or the presumption thereof great.

*Anderson*, 493 P.2d at 899 & n.45.

**{20}**    Subsequent developments explained the import of this cryptic footnote. Within months after the decision in *Anderson*, the voters of California approved a constitutional amendment to reinstate capital punishment and effectively supersede *Anderson*. *See Strauss v. Horton*, 207 P.3d 48, 90 (Cal. 2009) (observing that the 1972 constitutional amendment

restored capital punishment, "subject to legislative amendment or repeal by statute, initiative, or referendum" (internal quotation marks and citation omitted)), *abrogated on other grounds*, *Obergefell v. Hodges*, ___ U.S. ___, 135 S. Ct. 2584 (2015). In the forty-five years since that state constitutional amendment reinstating the death penalty, California courts have consistently interpreted the "capital crimes" provisions of the California Constitution—*see* Cal. Const. art. I, § 12 (amended 1974, 1982, 1994); Cal. Const. art. I, § 28 (amended 1982, 2008)—to mean crimes which the legislature has considered so serious as to permit imposition of capital punishment. Less than two years after *Anderson* was decided, and after the California legislature reclassified offenses eligible for the death penalty under the authority of the 1972 constitutional amendment, *see* Cal. Penal Code § 190.2 (1973 Cal. Stat. at 1297, 1299-1300), the California Supreme Court clarified its *Anderson* footnote to explain that what makes an offense capital is statutory authorization of the death penalty for its commission, *see In re Boyle*, 520 P.2d 723, 725 (Cal. 1974) (explaining that "[n]othing we said in footnote 45 was intended to govern a situation in which the Legislature acts to declare a new and different class of 'capital offenses'").

**{21}** Because the murder crimes with which the defendants in *Boyle* were charged were statutorily punishable only by life imprisonment and not punishable by capital punishment in the absence of a killing for hire or other statutory "special circumstances" of Cal. Penal Code Section 190.2 (1973), the California Supreme Court held that the charged crimes could not be considered "capital offenses" in the constitutional sense. *Boyle*, 520 P.2d at 724. As the court noted, "[t]he constitutional provision does not itself define the term; it simply withholds in such cases a constitutional right to bail, and impliedly grants to the Legislature the power to implement that exception," which the legislature did when it "delineated the class of such cases by substantive provisions imposing the death penalty for specified offenses." *Id.* at 725.

**{22}** No California case has ever taken the position that the legislature may classify a non-capital-punishment crime as capital in the constitutional sense and thereby justify denial of pretrial release. In fact, post-*Anderson* cases have repeatedly emphasized that the reference to capital crimes in the California Constitution applies to crimes which the legislature has considered so serious as to permit imposition of capital punishment. *See, e.g.*, *People v. Superior Court*, 25 Cal. Rptr. 2d 38, 39 (Cal. Ct. App. 1993) ("It is well established a capital offense is one which carries the maximum possible penalty of death."); *In re Bright*, 17 Cal. Rptr. 2d 105, 108 (Cal. Ct. App.1993) ("It is the statutory availability of the ultimate penalty which renders the crime charged a capital offense.").

**{23}** California lawmakers have demonstrated their awareness that the legislature is not free to create constitutional capital offenses simply by statutorily categorizing non-capital-punishment crimes as capital. In 1982, the legislature proposed and the voters adopted amendments to the California Constitution to add categories of felonies other than capital offenses for which bail could be denied, including violent crimes when a court finds that the defendant's release would create a likelihood of great bodily harm to others. Cal. Const. art. 1, § 12 (amended 1982). In 1994, Article 1, Section 12 was amended again to add sexual

assaults to the list of offenses which could result in pretrial detention. Cal. Const. art. 1, § 12 (amended 1994). If California law had permitted the legislature to categorize any crime as constitutionally eligible for pretrial detention simply by attaching a statutory capital label to the crime, neither of those constitutional amendments would have been necessary.

**{24}** Despite the California Supreme Court's repeated clarifications of its *Anderson* dictum, footnote 45 took on a life of its own. It was replicated without further analysis in judicial opinions elsewhere that were dealing with the consequences of judicial, and not legislative, determinations that statutory provisions for capital punishment could not be enforced. But an analysis of the law in those states confirms that those jurisdictions also never permitted the legislature to abolish capital punishment for an offense while calling the crime capital for purposes of denying an express constitutional guarantee of pretrial release in noncapital cases.

## 2.    Colorado

**{25}** Within months of the decision in *Anderson*, the Colorado Supreme Court adopted *Anderson*'s footnote 45 in a brief opinion following the court's determination that the Colorado capital punishment statute could not be constitutionally applied as a result of the United States Supreme Court's *Furman* opinion, rendering capital punishment statutes unenforceable throughout the United States. *People ex rel. Dunbar v. Dist. Court*, 500 P.2d 358, 359 (Colo. 1972) (per curiam). At the time of the *Dunbar* opinion, the Colorado statutes provided that murder could be punished by death. *See* Colo. Rev Stat. § 40-1-105 (1971 Colo. Sess. Laws at 390, 490) (prescribing death as the maximum penalty for a class 1 felony); Colo. Rev. Stat. § 40-3-102(3) (1971 Colo. Sess. Laws at 418, 490) (specifying first-degree murder as a class 1 felony). *Dunbar* merely recited that murder remained a capital offense for which bail could be denied under the Colorado Constitution. *Dunbar*, 500 P.2d at 359; *see* Colo. Rev. Stat § 40-1-105(3)-(4) (1974 Colo. Sess. Laws at 251-52, 254) (adding Subsection (4), which substituted life imprisonment for death as the maximum penalty for a class 1 felony if the Colorado death penalty is held unconstitutional). *Dunbar* did not address the issue before us. In fact, Colorado has never statutorily abolished capital punishment in the years since *Furman* and *Dunbar*. *See* Colo. Rev. Stat. § 18-3-102(3) (2000) ("Murder in the first degree is a class 1 felony."); Colo. Rev. Stat. § 18-1.3-1201(1)(a) (2014) ("Upon conviction . . . of a class 1 felony, the trial court shall conduct a separate sentencing hearing to determine whether the defendant should be sentenced to death or life imprisonment.").

**{26}** Following the judicial invalidation of Colorado's capital punishment statute that led to the *Dunbar* decision, Colorado amended its murder statute to continue imposition of capital punishment. Colo. Rev. Stat § 39-11-103(5) (1974 Colo. Sess. Laws at 252-54). Both before and after that amendment the legislature did not explicitly label the crime of murder as a capital crime; instead, it made murder a capital offense by statutorily providing the possibility of capital punishment for class 1 felonies. *See* Colo. Rev. Stat. § 40-2-3(a)-(c) (1965 Colo. Sess. Laws at 502-04) (allowing the death penalty under the murder statute then-

existing); Colo. Rev. Stat. §§ 40-1-105 and 40-3-102(3) (1971 Colo. Sess. Laws at 390, 418, 490) (promulgating a new Colorado Criminal Code that allowed for the death penalty for class 1 felonies and designated first-degree murder as a class 1 felony); Colo. Rev Stat. § 18-3-102(3) (2000) (providing, currently, that "[m]urder in the first degree is a class 1 felony"); Colo. Rev. Stat. § 18-1.3-104(1)(c) (2016) (continuing, under this current penalty statute, to allow the death penalty for class 1 felonies).

{27}     No case in Colorado has ever held that the legislature could statutorily abolish the possibility of capital punishment for an offense and still classify the offense as "capital" for the purpose of denying the constitutional right to pretrial releases. When the legislature acted to permit denial of bail for crimes other than offenses that statutorily authorized imposition of the death penalty, it did not simply statutorily label those additional non-capital-punishment offenses as some category of capital felony. Instead, the legislature submitted to Colorado voters a constitutional amendment adding to the historical capital offenses exception a list of other offenses for which bail could be denied.

{28}     Prior to 1983, Article II, Section 19 of the Colorado Constitution provided that, pending disposition of charges, "'all persons shall be bailable by sufficient sureties except for capital offenses, when the proof is evident or the presumption great.'" *Corbett v. Patterson*, 272 F. Supp. 602, 608 (D. Colo. 1967) (quoting the Colorado Constitution). In 1982, that constitutional provision was repealed and reenacted, retaining the original bail exception for capital offenses and adding exceptions for dangerousness and noncapital violent crimes. *See* 1982 Colo. Sess. Laws 685-86. A 1994 constitutional amendment deleted an exception not at issue here, left the rest of the 1982 changes intact, and added new exceptions for postconviction bail. *See* 1994 Colo. Sess. Laws 2853-55.

{29}     As was the case in California, if a simple statutory classification could make a non-death-penalty-eligible crime a capital offense in the constitutional sense, no constitutional amendment would ever have been necessary.

### 3.     Nevada

{30}     In initially dealing with the aftermath of *Furman*, the Nevada Supreme Court adopted the *Anderson* footnote in another brief opinion with no analysis, stating only, "We adopt the California view and affirm the order of the trial court [denying release]." *Jones v. Sheriff, Washoe Cty.*, 509 P.2d 824, 824 (Nev. 1973) (per curiam). As in California and Colorado, the Nevada statutes still facially authorized imposition of capital punishment for murder. More important to our analysis, the Nevada Supreme Court explicitly reconsidered its reliance on the *Anderson* footnote just a year later in *St. Pierre v. Sheriff, Washoe Cty.*, 524 P.2d 1278 (Nev. 1974):

> The California Supreme Court recently reevaluated the *Anderson* rationale in [*Boyle*], after the California legislature (1) enacted a procedural statute "forbidding bail in capital cases in which the proof is evident or the

10

> presumption great . . . and (2) delineated the class of such cases by substantive provisions imposing the death penalty for specified offenses."
>
> . . . .
>
> The legislative prerogative to implement the bail provisions of [the Nevada] Constitution does not encompass inclusion of a non-capital offense as non-bailable; accordingly, we hold [the corresponding Nevada statute] unconstitutional. Only those persons charged with the newly designated capital offenses may now be denied bail, "when the proof is evident, or the presumption great." Nev. Const. Art. 1, § 7.

*St. Pierre*, 524 P.2d at 1279-80 (first omission in original).

{31}    Nevada, like California and Colorado, realized the need to amend its state constitution to permit pretrial detention of defendants other than those charged with death-penalty offenses. In 1980, Nevada voters approved a legislative proposal to amend the Nevada Constitution, adding the category of "murders punishable by life imprisonment without possibility of parole" as nonbailable. Nev. Const. art. 1, § 7.

### 4.    Mississippi

{32}    *Hudson*, 268 So. 2d 916, does not support the characterization of Mississippi as a classification-theory jurisdiction. In *Hudson*, another post-*Furman* case that quickly followed the short-lived 1972 *Anderson* footnote, the Mississippi Supreme Court held that so long as the legislature prescribed the death penalty for an offense, it would be considered a capital offense for bail purposes. *See Hudson*, 268 So. 2d at 921-23 ("In order to retain the constitutional plan for the designation of capital offenses, we hold that a capital case is any case where the permissible punishment prescribed by the Legislature is death, even though such penalty may not be inflicted since the decision of *Furman*.").

{33}    Four years later in *Dennis*, 334 So. 2d at 370, the Mississippi Supreme Court addressed a situation strikingly similar to the one before us, involving an offense that was once punishable by death but which as a result of a statutory change no longer could result in capital punishment. *Dennis* explicitly held "that the legislature had no authority to amend the constitution by redefining the term 'capital offenses' found in" the bail provisions of the Mississippi Constitution, which had always been construed as crimes "which permitted the death penalty." *Dennis*, 334 So. 2d at 372-73 (holding that "the constitution can only be modified by constitutional amendment").

{34}    The post-*Furman* statutory abolition of capital punishment for armed robbery meant that armed robbery was no longer a capital offense within the meaning of the Mississippi Constitution despite the fact the legislature still labeled it as a capital offense for statutory classification purposes. *See Dennis*, 334 So. 2d at 373. Accordingly, *Dennis* held that a

11

defendant charged with armed robbery after statutory abolition of capital punishment for the offense was constitutionally entitled to bail. *See id.*

{35}     Mississippi subsequently amended its constitution to supplement the capital offense exception to the right to bail by authorizing pretrial detention in a number of non-capital-punishment offenses. Miss. Const. art. 3, § 29 (amended 1987, 1995).

## 5.     Louisiana

{36}     *Tribe* cited three Louisiana opinions in support of its statement that Louisiana had adopted a classification theory for interpreting the constitutional meaning of capital offense. *See Tribe*, 593 P.2d at 1371 n.3 (citing *State v. Hunter*, 306 So. 2d 710 (La. 1975); *State v. Flood*, 269 So. 2d 212 (La. 1972), *superseded by statute*, La. Stat. Ann. §§ 14:30 and 14:30.1 (1973 La. Acts at 218-21); and *State v. Holmes*, 269 So. 2d 207 (La. 1972), *superseded by statute*, La. Stat. Ann. §§ 14:30 and 14:30.1 (1973 La. Acts at 218-21)). *Holmes* and *Flood* were companion cases that were issued on the same day addressing the statutory and constitutional meaning of capital offenses following the *Furman* decision. *Holmes* dealt with the term "capital offenses" in the context of a state constitutional right to a unanimous twelve-person jury in capital cases, *see* 269 So. 2d at 209, and *Flood* focused on excluding those charged with "capital offenses" from the constitutional right to bail, *see* 269 So. 2d at 214.

{37}     Relying on the California *Anderson* footnote and the Colorado *Dunbar* opinion that itself had relied on *Anderson*, a majority of the divided Louisiana Supreme Court stated that it also agreed with a classification theory. Important to what the Louisiana court meant by "classification of crimes" is its explanation that "when [the] legislature last acted with respect to it, murder was, as it has ever been, a capital crime." *Flood*, 269 So. 2d at 214 (observing that "the penalty is what made murder a capital offense"); *see also Holmes*, 269 So. 2d at 208 (explaining that "[t]he word 'capital' in criminal law has to do with the death penalty"). The court emphasized the difference between a case where the "legislature eliminated capital punishment" and cases like *Flood* and *Holmes*, where a judicial decision had barred implementation of the statutory punishment. *See Holmes*, 269 So. 2d at 209; *see also Flood*, 269 So. 2d at 214 ("Furman . . . does not destroy the system of classification of crimes in Louisiana."). The court therefore held that it would continue to treat offenses statutorily prescribing capital punishment as capital offenses, "at least until the legislative process has reorganized the criminal law and procedure in view of *Furman*." *Holmes*, 269 So. 2d at 209.

{38}     Following the decisions in *Flood* and *Holmes*, the Louisiana Legislature acted quickly to amend some of its capital punishment statutes, dividing murder into two classifications, first-degree with a mandatory death sentence and second-degree with a sentence of life imprisonment. *State v. Washington*, 294 So. 2d 793, 793 (La. 1974). In *Washington*, a trial judge had denied bail to a second-degree murder defendant on the basis of the decisions in *Flood* and *Holmes*. *See Washington*, 294 So. 2d at 793. The Louisiana

Supreme Court reversed, observing that at the time of those two earlier decisions the single offense of murder had still been statutorily a capital offense but that as a result of the amended statutes providing "no death penalty for [second-degree murder], bail must be granted." *Id.* at 794; *cf. Hunter*, 306 So. 2d at 712 (holding that a statutorily defined death penalty offense committed during the period before the amended capital punishment statutes were enacted should be treated as a capital offense for all purposes other than punishment).

{39}    Several years later, the Louisiana Supreme Court decided another significant case on the constitutional meaning of capital offense, *State v. Polk*, 376 So. 2d 151, 152 (La. 1979). In *Polk* the defendant was denied bail based on the capital offense exception in a prosecution for aggravated kidnapping, an offense which statutorily was subject to capital punishment but which, because of judicial decisions, could not result in imposition of the death penalty. *See id.* The Louisiana Legislature had not acted to revise its kidnapping statutes to bring them into compliance with constitutional requirement over the course of three sessions that had been convened since the statutes were judicially held to be unconstitutional. *See id.* at 153. The Louisiana Supreme Court made it clear that its temporary classification-theory resolutions in *Flood* and *Holmes* had never been intended to be a permanent state of affairs:

> We did not intend by our holdings to permit the constitutional right of bail in non-capital crimes to be indefinitely curtailed by legislative inaction in re-classification or re-regulation in instances where the death penalty provided by a statute is judicially held to be unconstitutional, whether the inaction be through oversight or otherwise; nor did we intend to hold that the constitutional provision requiring bailability could be evaded by arbitrary legislative classification as capital of a crime for which constitutionally no death penalty may be imposed.

*Polk*, 376 So. 2d at 153 (footnote omitted). *Polk* held that because the legislature had not promptly reformed its statutes to classify which crimes were constitutionally punishable by death, the defendant was entitled to be released on bail for an offense that was statutorily eligible but judicially ineligible for imposition of capital punishment. *See id.*

{40}    More recently, in *State v. Serigne*, 232 So. 3d 1227 (La. 2017), the Louisiana Supreme Court engaged in a retrospective review of its case law in this area:

> In cases that followed *Furman*, this court grappled with the implications of a constitutionally unenforceable death penalty that had not yet been repealed or replaced by the legislature. For example, in [*Flood*], the court found that murder remained classified as a capital offense for purpose of determining whether an accused is entitled to bail.

*Serigne*, 232 So. 3d at 1229 (emphasis omitted). The court noted that "*Flood* and *Holmes* arose in a particularly unusual and volatile era of developing death penalty jurisprudence and associated legislative responses" but that Louisiana now has "broadly rejected the prior

13

'capital classification' jurisprudence," making it clear that a case where a defendant does not face the prospect of the death penalty is simply not a capital case. *Serigne*, 232 So. 3d at 1230-31.

### 6. Washington

**{41}** *State v. Haga*, 504 P.2d 787 (Wash.1972) (en banc), *clarified by State v. Anderson*, 736 P.2d 661 (Wash. 1987) (en banc), has also been offered as support for the classification theory. *See Tribe*, 593 P.2d at 1371 & n.5. The opposite appears to be true.

**{42}** Long before *Haga* was decided, the Washington Supreme Court interpreted its constitution's reference to "capital offense" to mean "not whether the death penalty must necessarily be imposed, but whether it may be imposed" for a particular crime. *Ex parte Berry*, 88 P.2d 427, 428 (Wash. 1939). *Haga* was a post-*Furman* case addressing the right of a first-degree murder defendant to bail on appeal following judicial recognition in *State v. Baker*, 501 P.2d 284, 284-85 (Wash. 1972) (en banc), that the *Furman* holding made Washington's statutory death penalty unenforceable. *See Haga*, 504 P.2d at 788.

**{43}** Citing the California Supreme Court *Anderson* opinion, 493 P.2d at 899 n.45, as support, the Washington Supreme Court held that first-degree murder remained a capital offense as that term was used in the bail provisions of Article 1, Section 20 of the Washington Constitution. *Haga*, 504 P.2d at 788-89. But more illuminating than the brief reference to the California *Anderson* case was the Washington Supreme Court's approval of the reasoning in its own precedent in *Berry* that what makes an offense capital is not determined by whether capital punishment is to be imposed in a particular case but instead "'by the statutory penalty prescribed against its commission.'" *Haga*, 504 P.2d at 789 (quoting *Berry*, 88 P.2d at 433).

**{44}** If there remained any doubt about the Washington Supreme Court's stance that the legislative penalty, instead of the legislative label, is the determining factor in what makes an offense capital in the constitutional sense, it was resolved in the Washington Supreme Court's subsequent clarification of *Haga* in its *Anderson* holding that whether a defendant is charged with a capital offense in the constitutional sense "depends upon whether the defendant committed a crime which *could* be punished with the death penalty." *Anderson*, 736 P.2d 662-63.

**{45}** In 2010, Washington also amended its 1889 constitution to add to capital offenses a second exception to the right to pretrial release: "Bail may be denied for offenses punishable by the possibility of life in prison upon a showing by clear and convincing evidence of a propensity for violence that creates a substantial likelihood of danger to the community or any persons, subject to such limitations as shall be determined by the legislature." Wash. Const. art. I, § 20.

### 7. Utah

**{46}** Both *State v. James*, 512 P.2d 1031 (Utah 1973), and *Roll*, 516 P.2d 1392, addressed the constitutional definition of capital offenses after judicial invalidation of the Utah death penalty in the wake of *Furman*. *See Tribe*, 593 P.2d at 1371 & n.2.

**{47}** *James* focused on the Utah Constitution's guarantee that a jury could consist of only eight jurors "'except in capital cases.'" *James*, 512 P.2d at 1032. Relying specifically on the California *Anderson* decision, *James* stated that the theory related to "a category of offenses for which the punishment of death might be imposed," even where "punishment by death cannot constitutionally be exacted" as a result of judicial decisions. 512 P.2d at 1033 & n.8 (citing cases from Colorado, Louisiana, and Washington). Accordingly, because the defendant in *James* was charged with first-degree murder, an offense that had "been classified as a capital crime by the legislature," he was entitled to be tried before a twelve-person jury. *Id.* at 1034.

**{48}** *Roll*, decided a few months after *James*, dealt with the meaning of the capital offense exception to the right to bail in the Utah Constitution. *See Roll*, 516 P.2d at 1392. While *Roll* endorsed a classification theory, it made clear that its understanding of that theory depended on the legislature's classifying an offense as capital by prescribing the possibility of capital punishment:

> The "classification" theory proceeds on the concept that the constitution and statutes refer to a category of offenses for which the punishment of death might be imposed. The legislature determines the proper classification of a crime according to its gravity, and this classification endures, although punishment by death may not constitutionally be imposed.

*Roll*, 516 P.2d at 1393.

**{49}** In 1973, Utah amended the capital offense exception to the right to bail in Article I, Section 8 of the Utah Constitution by adding additional circumstances in which bail could be denied, in cases where a defendant is accused of committing any felony while released on probation, parole, or bail for a previous felony offense. *Scott v. Ryan*, 548 P.2d 235, 236 (Utah 1976).

**{50}** In 1988, Article I, Section 8 was amended again to add the current provision, denying bail for

> persons charged with any other crime, designated by statute as one for which bail may be denied, if there is substantial evidence to support the charge and the court finds by clear and convincing evidence that the person would constitute a substantial danger to any person or to the community or is likely to flee the jurisdiction of the court if released on bail.

Utah Const. art. I, § 8(1)(c); *see State v. Kastanis*, 848 P.2d 673, 674 (Utah 1993) (per

15

curiam). The 1988 amendment thereby explicitly granted the legislature new constitutional authority to statutorily designate non-capital-punishment crimes as nonbailable.

### 8.    Alabama

**{51}**    *Ex parte Bynum*, 312 So. 2d 52 (Ala. 1975), was another interpretation of a capital offense exception to the state constitutional right to bail decided as a result of *Furman's* invalidation of statutory capital punishment provisions. *Bynum* adopted the classification theory expressed in several other jurisdictions' post-*Furman* decisions and held that "[t]he only effect of *Furman* was to eliminate the imposition of the death penalty as it was then enforced, and not to eliminate the classification whereby crimes are categorized as capital for purposes other than punishment." *Bynum*, 312 So. 2d at 55.

**{52}**    *Bynum* acknowledged established Alabama case law "interpret[ing] the term 'capital offense' to mean offenses for which the death penalty may be imposed." *Id.* (citing *Lee v. State*, 13 So. 2d 583 (Ala. 1943), and *Ex parte McCrary*, 22 Ala. 65 (1853)). But *Bynum* noted, "these opinions were not written in the context of *Furman* (which deals solely with the matter of constitutionally permissible punishment), and their application to the classification of capital offenses for the purposes of bail is not . . . decisive." *Bynum*, 312 So. 2d at 55.

**{53}**    After *Furman* was decided, the Alabama legislature amended its criminal statutes, which continue to classify as capital offenses aggravated murders that are "punish[able] by a sentence of death or life imprisonment without parole." Ala. Code § 13A-5-39(1) (2016); Ala. Code § 13A-5-40 (1981). No Alabama case has yet addressed the extent to which the legislature may constitutionally classify a non-capital-punishment offense as a capital offense, as that term is used in the Alabama Constitution.

### 9.    Oklahoma

**{54}**    *In re Kennedy*, 512 P.2d 201, 203 (Okla. Crim. App. 1973), was also a post-*Furman* case relying on California's *Anderson* opinion to hold that the *Furman* decision "d[id] not give rise to a right to bail previously excluded as a capital offense." The court held that the framers of the constitution and the legislature "did not intend bail to be denied on the basis of the punishment to be imposed alone, but used the punishment, the death penalty, as a method of characterizing those offenses in which the gravity was so great that bail should be denied." *Kennedy*, 512 P.2d at 203. The court then provided guidance on how the legislature could constitutionally classify a crime as a capital offense ineligible for bail:

> Any new categorization of offenses invoking the possibility of the assessment of the death penalty in a particular case will be deemed to be a restatement by the legislature and reclassification of offenses of such a gravity to allow denial of bail when the probability is the accused will receive a life or death sentence.

*Id.* at 203-04.

**{55}** As had occurred in a number of other states, Oklahoma supplemented its constitution's capital offenses exception in 1988 by adding categories of offenses where bail could be denied to persons charged with "violent offenses, . . . offenses where the maximum sentence may be life imprisonment or life imprisonment without parole, . . . felony offenses where the person charged . . . has been convicted of two or more felony offenses," and drug crimes with potential sentences of at least ten years imprisonment. Okla. Const. art. II, § 8. The Oklahoma bail statutes were amended to provide that all defendants are entitled to be released on bail "in criminal cases where the offense is not punishable by death" and where those new constitutional bail exception categories do not apply. *See* Okla. Stat. tit. 22, § 1101 (2006) (including Subsections (A), providing that "bail . . . shall be admitted upon all arrests," and (C), specifying the constitutional bail exception categories); *see also* Okla. Stat. tit. 22, § 1101 (2004 Okla. Sess. Laws at 316-17) (including Subsection (A) but not (C)).

## 10.    West Virginia

**{56}** West Virginia law provides no support for a classification theory to interpret the constitutional meaning of capital offenses. The West Virginia constitutional right to bail contains no reference at all to capital offenses and instead, like the Eighth Amendment to the United States Constitution, guarantees only that where bail is granted it may not be excessive. *See* W. Va. Const. art. III, § 5 ("Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted."); *United States v. Salerno*, 481 U.S. 739, 752 (1987) ("The Eighth Amendment addresses pretrial release by providing merely that '[e]xcessive bail shall not be required.' This Clause, of course, says nothing about whether bail shall be available at all." (quoting the United States Constitution) (alteration in original)).

**{57}** The West Virginia case cited in *Tribe* was neither a bail case nor a case involving the relationship between a constitutional term and a statutory term; instead it dealt with the application of a statute authorizing transfer of cases, which addressed statutorily categorized capital offenses that were not statutorily subject to capital punishment, from juvenile court to adult court. *See Lycans v. Bordenkircher*, 222 S.E.2d 14, 17-18 (W. Va. 1975), *overruled on other grounds*, *Thomas v. Leverette*, 273 S.E.2d 264 (W. Va. 1980). West Virginia law therefore provides no assistance in determining whether a legislature may statutorily expand the scope of a constitutional term on a classification theory or any other theory.

## 11.    Overview of the classification-theory cases

**{58}** The preceding state-by-state analysis of the law in each of the purported classification-theory states leads to several global conclusions. First, to the extent a classification theory in any of those jurisdictions constituted a departure from the historical interpretation of the constitutional term "capital offenses" in the context of bail rights, it was a short-lived response to the jurisprudential uncertainty in the brief period between the

17

*Furman* decision and the subsequent legislative designation of death penalty offenses in reformed capital punishment statutes.

**{59}** Second, the classification-theory cases dealt only with the consequences of judicial determinations that capital punishment statutes could not be enforced, not with legislative abolition of capital punishment for an offense.

**{60}** And third, the manner in which legislatures were able to classify crimes as "capital offenses" that would be subject to denial of bail was not simply by labeling crimes with the word "capital" but by prescribing the possibility of imposing capital punishment, which means the death penalty, for their commission.

**{61}** The crime with which Defendant is charged would not be a capital offense as defined in the constitutions of any of the purported classification-theory jurisdictions because the New Mexico Legislature itself has statutorily classified murder as a noncapital offense by abolishing the possibility of capital punishment for its commission.

**D.      As a Result of the 2009 Legislative Abolition of Capital Punishment, There Are Currently No New Mexico Capital Offenses for Which Bail May Be Categorically Denied Under Article II, Section 13**

**{62}** Unlike some states, New Mexico never adopted a classification theory to respond temporarily to judicial invalidation of the death penalty, and we are not called upon to consider that kind of issue here. Instead, we are asked by the State to do something much more unprecedented: to adopt an alternative classification theory by holding that the Legislature itself can statutorily abolish any possibility of capital punishment for a crime while still labeling the crime as a capital offense for which the constitutional right to bail may be denied. We now address the considerations of principle and practicality that are necessarily raised by this novel classification theory.

**{63}** We have been offered no standard by which a reviewing court could determine whether a legislature has exceeded its constitutional limitations if the legislature were deemed to have authority to label non-death-penalty crimes as capital offenses for which the constitutional right to bail would not apply. Could the legislature label any offense a capital offense simply because it thought the crime serious enough to justify denial of bail? How many categories of capital offenses could a legislature create? Could it, for example, legislate that all first- and second-degree felonies are categories of capital offenses? All felonies? DWI or other misdemeanors? Could such a classification power depend on whether and when the statutes provide that a non-death-eligible defendant would be eligible for parole consideration? If the term were to apply to offenses for which statutes once authorized the death penalty, would it apply to all former capital punishment crimes or just those that existed at some particular point in history between adoption of the New Mexico Constitution and repeal of the death penalty? *See, e.g.*, Section 1151 (1887), C.L. 1897 at 356 (codifying the territorial statute prescribing the death penalty for nonhomicidal train robbery,

18

recompiled after statehood as NMSA 1915, § 1642 (1887), C.L. 1915 at 536, and repealed by 1963 N.M. Laws, ch. 303 at 827); *see also* Arie W. Poldervaart, *Black-Robed Justice* 179, 181-83 (Arno Press ed. 1976) (1948) (describing the trial and hanging of train robber Thomas "Black Jack" Ketchum); *Territory v. Ketchum*, 1901-NMSC-006, ¶¶ 2, 15, 10 N.M. 718, 65 P. 169 (affirming Ketchum's sentence of death for an attempted train robbery in which no one was killed).

**{64}** Any attempt to tie such a theoretical legislative classification authority to any guiding standard other than a statutory capital punishment penalty would not only be ungrounded in principle, it would be unworkable in practice. Without a firm defining reference like the only obvious one—a textual statutory provision legislating the possibility of capital punishment—there would be no articulable standard to guide either a legislature or a reviewing court in interpreting the application of the constitutional right to bail in noncapital cases.

**{65}** The lack of any law-based principled or practical standard for determining the bounds of the "capital offenses" term in Article II, Section 13 of the New Mexico Constitution, at least if we abandon the clear historical standard of the possible imposition of the death penalty, is the fatal flaw in the proposed classification theory in this case. If the Legislature were to be given the sweeping power to attach a capital label to any offense and thereby justify denial of bail under the Bill of Rights to our Constitution, the Constitution would itself no longer have any more meaning than the language of Lewis Carroll's Wonderland character, Humpty-Dumpty. Lewis Carroll, *Through The Looking Glass* 57 (Susan L. Rattner ed., Dover Publ'ns., Inc. 1999) (1872) ("'When *I* use a word,' Humpty Dumpty said, in rather a scornful tone, 'it means just what I choose it to mean—neither more nor less.'").

**{66}** We recognize that the continued statutory use of the capital felony categorization after New Mexico's statutory abolition of capital punishment has resulted in confusing alternative uses of the "capital" adjective in New Mexico statutes and judicial opinions. The State correctly cites a number of opinions filed after New Mexico abolished capital punishment in which this Court has "continued to refer to first-degree murder as a capital crime in cases where the defendant has been sentenced to life imprisonment." *See, e.g.*, *State v. Serna*, 2013-NMSC-033, ¶ 33, 305 P.3d 936 (stating that "murder" is "a capital felony"); *State v. Dowling*, 2011-NMSC-016, ¶ 8, 150 N.M. 110, 257 P.3d 930 ("First degree murder is a capital felony."). While those cases did not involve any interpretation of the constitutional term "capital offenses," we acknowledge that all concerned, including this Court, should try to lessen any confusion in addressing the differing statutory and constitutional uses of the word "capital."

**{67}** The indiscriminate use of that term leads to confusion in applying the law. For example, the Court of Appeals stated in *State v. Segura*, 2014-NMCA-037, ¶ 7, 321 P.3d 140, that "[u]nder Article II, Section 13 of the New Mexico Constitution, every accused, except a person accused of first degree murder where the proof is evident or the presumption

19

great, is entitled to bail." But that statement was based on neither New Mexico precedent nor the wording of the New Mexico Constitution. The Constitution does not say that bail may be categorically denied in cases of first-degree murder; it says bail may be denied for persons charged with capital offenses. Unlike some other states which have expanded the categorical detention authority in their constitutions to include persons charged with crimes subject to life sentence and other categories of crimes, New Mexico has never done so.

**{68}** This Court has never explicitly or implicitly held that nonbailable capital offenses in Article II, Section 13 include crimes not statutorily punishable by capital punishment. To permit any branch of government to redefine constitutional terms would violate the exclusive power of the people to amend the Constitution. *See Ferguson v. N.M. State Highway Comm'n*, 1982-NMCA-180, ¶ 6, 99 N.M. 194, 656 P.2d 244 ("The legislature's plenary authority is limited only by the state and federal constitutions." (citing *Daniels v. Watson*, 1966-NMSC-011, 75 N.M. 661, 410 P.2d 193)); N.M. Const. art. XIX, § 1 ("An amendment that is ratified by a majority of the electors . . . shall become part of this constitution."). We have no authority to preclude the Legislature's use of the term "capital felony" or any other form of words in classifying crimes for nonconstitutional purposes, but no branch of government has the lawful authority to transform the intended meaning of constitutional terms.

**{69}** As a result of this Court's research conducted after initial briefing and oral argument, we are unanimous in holding that the term "capital offenses" in Article II, Section 13 of the current New Mexico Constitution means, as it always has, offenses for which a statute authorizes imposition of the death penalty. To the extent that *Segura* or any other cases may be read to increase the offenses for which bail may be categorically denied under the capital offenses provision of Article II, Section 13 of the New Mexico Constitution, those cases are overruled.

**{70}** There being no death penalty statutorily authorized for any crimes committed on or after July 1, 2009, following legislative repeal of the last vestiges of capital punishment for offenses committed on or after that date, and Defendant having been charged with committing his offense after that date, the detention order based on the capital offenses exception must be reversed. Because Defendant is not detainable under the capital offenses provision, there is no need to reach any further issues related to procedures for that provision's implementation.

**E.      Pretrial Detention May Be Ordered in Compliance with the New Detention-for-Dangerousness Authority in Article II, Section 13**

**{71}** Our holding does not mean the district court lacks authority to deny pretrial release of a defendant charged with a crime that is no longer a capital offense. In fact, our district courts now have a much broader evidence-based detention authority applicable in both capital and noncapital felony offenses. In 2016, the Legislature proposed and the voters of New Mexico approved an amendment to the bail rights in Article II, Section 13 of the New

20

Mexico Constitution, authorizing pretrial detention of dangerous defendants where "no release conditions will reasonably protect the safety of any other person or the community." N.M. Const. art. II, § 13 (amendment effective November 8, 2016); *see Torrez v. Whitaker*, 2018-NMSC-005, ¶ 72, 410 P.3d 201.

**{72}** The State's motion to detain Defendant in this case was based on the new constitutional authority instead of the older capital offenses provision relied on sua sponte by the district court. Following oral argument in this case, we remanded this matter for consideration of the State's unaddressed request. Because we have no ruling or evidentiary record on which to review whether Defendant should have been detained under the new authority, nothing in this opinion is intended to prejudge those issues.

## III. CONCLUSION

**{73}** For the reasons stated herein, we confirm our previous order holding that first-degree murder is not currently a constitutionally defined capital offense in New Mexico that would authorize a judge to categorically deny release pending trial, and we also hold that any outright denial of pretrial release for a defendant charged with a noncapital offense must be based on the new evidence-based provisions of Article II, Section 13 of the New Mexico Constitution.

**{74}** **IT IS SO ORDERED.**

_____
**CHARLES W. DANIELS, Justice**

**WE CONCUR:**

_____
**JUDITH K. NAKAMURA, Chief Justice**

_____
**PETRA JIMENEZ MAES, Justice**

_____
**BARBARA J. VIGIL, Justice**

_____
**EDWARD L. CHÁVEZ, Justice, retired, sitting by designation**